**F I L E D**

**PUBLISH**

**August 19, 2005**

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**

GINA L. MILLER,

       Plaintiff-Appellant,

v.

AUTOMOBILE CLUB OF NEW
MEXICO, INC., doing business as
AAA New Mexico,

       Defendant-Appellee.

No. 03-2276

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-01-1372 WFD/ACT)**

Whitney Warner (Repps D. Stanford, with her on the briefs), of Moody & Warner,
P.C., Albuquerque, New Mexico, for the Plaintiff-Appellant.

Charlotte A. Lamont (Sarah K. Downey, with her on the brief), of Bannerman &
Williams, P.C., Albuquerque, New Mexico, for the Defendant-Appellee.

Before **SEYMOUR**, Circuit Judge, **McKAY**, Senior Circuit Judge, and
**MURPHY**, Circuit Judge.

**SEYMOUR**, Circuit Judge.

Gina L. Miller filed suit against AAA New Mexico, alleging disparate treatment on the basis of gender and age, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (ADEA), and retaliation under Title VII, the ADEA, and New Mexico state law. She also asserted a claim under the Equal Pay Act, 29 U.S.C. § 206(d) (EPA), along with state law claims for breach of an implied employment contract and breach of the covenant of good faith and fair dealing. The district court dismissed Ms. Miller's discrimination, retaliation, and EPA claims on summary judgment.[1] Her implied contract and breach of the covenant of good faith and fair dealing claims proceeded to trial, but the jury was unable to reach a verdict. The court declared a mistrial, and subsequently entered judgment as a matter of law on behalf of AAA New Mexico. Ms. Miller appeals the district court's rulings. We affirm.

# I

Ms. Miller's two basic contentions on appeal are that the district court erred in granting summary judgment and judgment as a matter of law to AAA New Mexico on her various claims. Our standards of review of these two

___

[1]During proceedings before the district court, Ms. Miller stipulated to the dismissal of her age discrimination and associated retaliation claims. Hence, we will not discuss them further.

judgments are highly similar and require that we view the facts in the light most favorable to the non-moving party. *See Coldesina v. Estate of Simper*, 407 F.3d 1126, 1130-31 (10th Cir. 2005) (reviewing grant of summary judgment *de novo*, and construing facts in light most favorable to non-moving party); *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000) (reviewing judgment as matter of law *de novo*, and viewing evidence and inferences drawn therefrom in favor of non-moving party). Under these required standards, the record reflects the following.

Ms. Miller began working for AAA New Mexico[2] in August 1996 as a part-time traffic reporter. Her position was officially classified as "senior clerk" and she was paid on an hourly basis.[3] Ms. Miller reported directly to Brenda Yager, manager of the Public and Government Affairs (PGA) department. At the start of her employment, Ms. Miller received a copy of the AAA New Mexico Handbook which detailed that her employment was at-will. The handbook also contained a

---

[2]AAA New Mexico is the wholly owned subsidiary of AAA Club Services, Inc. AAA Club Services, Inc., in turn, is the wholly owned subsidiary of the Automobile Club of Southern California. The Automobile Club of Southern California oversees the work of AAA organizations in New Mexico, Hawaii, Texas, and California.

[3]AAA New Mexico has both hourly and salaried employees. Salaried employees are deemed to hold "regular" positions and can be full-time or part-time. However, only regular employees receive benefits. When Ms. Miller began her employment with AAA New Mexico, she understood that as an hourly employee she was not entitled benefits.

disclaimer stating in part: "This at-will employment relationship may not be modified by any oral or implied agreement. No provision of this employee handbook, including the Involuntary Termination section . . . or of any Club policies shall create any contractual obligations inconsistent with the at-will nature of the employment relationship." App., vol. VII at 1369-70.

About three months after Ms. Miller began working for AAA New Mexico, Ms. Yager asked if she would be interested in working extra hours performing public relations duties at her current rate of pay. Ms. Miller agreed. Acknowledging the extra duties Ms. Miller had assumed, Ms. Yager gave her permission to call herself a "Public and Government Relations Specialist." Ms. Yager also had Ms. Miller distribute a memorandum to the rest of the AAA New Mexico staff indicating she had taken on additional duties, in conjunction with her traffic reporting duties, in the department.[4]

Sometime during the early part of 1997, Ms. Miller asked Ms. Yager whether she was working outside the scope of her official job description as a

---

[4]At some point during her employment with AAA New Mexico, Ms. Miller also began to refer to herself as "lead traffic reporter." Ms. Yager did not object to Ms. Miller using this title. While Ms. Miller was not in charge of the other traffic reporters, she did take on the responsibility of scheduling and training the other reporters, as well as maintaining a resource notebook for the department. She also had "direct contact with affiliates . . . [and] she was actually responsible for working with them to put together their contracts." App., vol. II at 274. This included filling in forms from AAA New Mexico's legal department, and then having any final negotiations approved by Ms. Yager.

part-time traffic reporter/senior clerk, and whether she was being paid appropriately. As Ms. Miller eventually testified at trial, Ms. Yager agreed that she was "working outside [her] job description at the time, and . . . agreed that the position should be graded higher, classified at a higher rate of pay." *Id.*, vol. III at 640. In response to Ms. Miller's query as to how or whether this could be rectified, Ms. Miller testified Ms. Yager told her

> not to worry, because the company was going through some changes and they were actually getting ready to evaluate positions throughout the company and that there was a good chance that the position was going to be reclassified, in fact, would be reclassified at that time and graded at a higher . . . rate.

*Id.* at 642.

In April 1997, Ms. Yager had Ms. Miller fill out two different job questionnaires for a job study. One questionnaire was for her position as part-time traffic reporter, and the other was to detail her public affairs duties. Ms. Yager stated that the questionnaires were to be used by human resources in the California main office to evaluate and reclassify positions.[5] She expected the

---

[5]All of AAA New Mexico's human resources functions were housed in and provided for by the Automobile Club of Southern California. The parent organization set "all of the human resource policies, benefits, compensation, salary grades, [and] titles," *id.*, vol. IV at 855, 1032, for its subsidiary companies. In order for Ms. Yager to create a regular salaried position within her department, she was required to seek permission from her direct supervisor to request human resources perform a job evaluation study. She could not unilaterally decide to reclassify a position or create a regular benefitted post. Rather, if the business

(continued...)

review and reclassification process would take "a few weeks . . . maybe two to three months at the most." *Id.* at 643. Ms. Miller anticipated that when the job study reclassification process was complete, she would receive increased compensation for her work.

The job study was completed in September 1997, but to both Ms. Miller's and Ms. Yager's dissatisfaction, the study did not "actually take the information that Ms. Miller provided and determine whether or not her title was correct or she was being paid correctly." *Id.*, vol. IV at 868. Rather, the study used the job questionnaires to perform a comparison between the different state AAA offices under the auspices of the Automobile Club of Southern California to ensure the current positions in the state offices were similarly ranked.[6] It was not the type of "true job study" Ms. Yager had expected or what she "was originally told . . . was going to happen." *Id.* at 867. Ms. Yager was unhappy with the results of the study, and continued to affirm to Ms. Miller that she thought Ms. Miller was performing duties outside of her job classification, and should be better

_____

[5](...continued)
needs of the department warranted reclassifying a position or creating a new one, a request could made for such, but any final job creation or classification decision had to be ultimately approved at "the executive level." *Id.* at 1037, 1064; *id.*, vol. VI at 1325-26.

[6]As a result of this company wide job study, Ms. Miller's official classification was changed from "senior clerk" to "clerk, intermediate." This change did not affect Ms. Miller's hourly pay rate.

compensated.  Ms. Yager promised Ms. Miller she was going to follow up with human resources and look into the problem.

On January 9, 1998, Ms. Yager sent a letter to her then direct supervisor, Steve Lenzi, urging the review of the staffing needs in her department, especially Ms. Miller's position.  Referring to the work Ms. Miller was performing as both a public relations assistant and a traffic reporter, she wrote that "[t]wo positions exist in the public and government affairs department . . . that need to [be] evaluated for correct title and salary grade." *Id.* at 874; *id.*, vol. VI at 1279.  She informed Mr. Lenzi she believed the current titles and grades were inappropriate and asked that the positions be upgraded.  She also noted that an upgrade of the two positions would impact Ms. Miller, who was then working about thirty-five hours a week.  Mr. Lenzi gave Ms. Yager permission to contact human resources to request they perform an evaluation of her department's needs as well as the positions for possible upgrading.

Ms. Miller further testified that during the winter of 1998, Ms. Yager assured her she was continuing her conversations with human resources and that Ms. Miller "would receive an upgrade and be reclassified based on the information that [Ms. Yager] had received from her management." *Id.*, vol. III at 657-58.  Ms. Miller testified she believed an "upgrade" meant "a new job title, the correct job description," *id.* at 658, and a "regular" position with full benefits,

in which she worked thirty-five hours a week. *Id.* at 657-58. She further testified that Ms. Yager stated the upgrade would happen "soon, within a few weeks or a few months." *Id.* at 659. However, Ms. Miller was unable to testify as to the exact date of the upgrade, or the exact salary she would receive upon that date. *Id.*

In the meantime, Ms. Yager's supervisors indicated to her that it would be easier to provide wage increases to her employees than to go through the process of creating regular posts. Ms. Yager testified she was informed that in order to create regular posts in her department "a job study would have to be done, and that it was a very lengthy process, and if I was looking at providing increased compensation immediately, [a pay raise] was the way to do it." *Id.*, vol. II at 282. Ms. Yager would rather have gone through the process of obtaining regular positions, but she nonetheless increased Ms. Miller's wage to $10.00 an hour. Upon determining that one of the employees who also received a raise had just joined the company and had been trained by Ms. Miller, Ms. Yager increased Ms. Miller's hourly rate to $10.50, retroactive to the date of the $10.00 wage increase.[7]

---

[7]When Ms. Miller began her employment with AAA New Mexico in August 1996, she earned $7.50 an hour. In February 1997, her wage was increased to $7.90 an hour. Then, in March 1998, her wage was raised to $10.00. She subsequently received the additional raise to $10.50 an hour, retroactive to

(continued...)

All of Ms. Miller's male colleagues in the PGA department were also classified as "clerk, intermediate" and worked in hourly part-time positions. There only appears to be one instance, during a three month period in 1997, when a male co-worker earned eight cents an hour more than Ms. Miller.[8] Between 1998 and the spring of 2000, however, no male in Ms. Miller's department received an hourly wage that surpassed hers.

In November or December 1998, Leigh Matthewson, Ms. Miller's mother, began working in the PGA department as a contract employee doing public affairs work. Ms. Yager eventually hired her in May 1999 in a hourly position with the official classification of "clerk, intermediate." At the time she was hired, Ms. Matthewson said she was interested in a position with benefits but Ms. Yager informed her she did not have a regular benefitted position to offer her. At trial, Ms. Matthewson testified she agreed to work for AAA New Mexico because of her understanding that the position she would be filling was in the process of being upgraded to a regular post. She was unable to identify a specific date upon

---

[7](...continued)
February 5 of that year. On February 28, 1999, her hourly rate was further increased to $10.68.

[8]In her response to AAA New Mexico's motion for summary judgment, as well as on appeal, Ms. Miller makes no reference to this apparent disparity, and instead asserts that her Title VII discrimination and EPA claims are based, in part, on the disparity in wages between her hourly rate and that of the men in her department from 1998 to 2000.

which the position would in fact be upgraded, or a date on which she would start receiving benefits.

In February 1999, Ms. Yager informed Ms. Miller she was still working on obtaining the upgrade. Ms. Miller testified Ms. Yager "had promised that the upgrade process was ongoing and that [the upgrade] would happen." *Id.*, vol. III at 675. Ms. Yager, Ms. Miller, and Ms. Matthewson participated in a number of brainstorming sessions during which they discussed how they hoped the department might be reorganized in light of the potential upgrades. Throughout this process, Ms. Yager testified she told the two women

> "you know, I don't know how much input, how much say I'm going to have. But certainly, let's talk about some things that might be workable. And if I have input, then that's good. Then I'm armed with better information and with how we think things might work best [for our department]."

*Id.*, vol. IV at 946.

In May of that year, Ms. Yager included two regular positions in her 2000 budget proposal. In submitting her budget request to her general manager, she noted that "[i]n the 2000 budget, I've upgraded [Ms. Miller's] and [Ms. Matthewson's] positions to regular employees rather than hourly. They already are working the hours (35 and 40 respectively) but they are not currently getting benefits. This is the one item that I would like to protect above others." *Id.* at 891; *id.*, vol. VI at 1285. Ms. Yager testified that her manager agreed to honor

-10-

her request.[9]

On July 1, 1999, Ms. Yager again met with Ms. Miller and Ms. Matthewson to discuss the status of the 2000 proposed budget which included the two regular positions. Ms. Miller's trial testimony indicated Ms. Yager informed the women "[t]he upgrades were imminent. They were going to come through any time . . . ." *Id.*, vol. III at 678-79; *id.*, vol. IV at 892. Ms. Yager testified that "I didn't say that was the final word. But yes, I said it was looking good, that at least at this juncture, we had a long ways to go in the budget, but at least as of this juncture, they were in the budget." *Id.*, vol. IV at 891-92. She also testified that "human resources temporarily approved for the use of [the titles of Public Affair Specialists] on business cards. And I actually said to them that they may not be the job titles that we end up with, but for right now, they're fine." *Id.* at 892; *id.*, vol. III at 678-79. Ms. Miller and her mother were "absolutely elated because [Ms. Yager] said the positions were approved or going to be approved, just within a short period of time . . . ." *Id.*, vol. IV at 991.

Around this time, Ms. Miller raised the question of whether she would receive retroactive pay for the public affairs work she had already performed for the PGA department. She testified Ms. Yager was not clear on the answer to this

---

[9]Ms. Yager testified that in the last two budgetary years she had requested the addition of a regular benefitted position in her department, but that her request was denied on both occasions.

question, but would look into it for her. Ms. Miller said Ms. Yager "believed I should receive retroactive compensation for the time that I have worked outside of my job description; that I had clearly been working out[side] of my job description for years . . . and that she believed I should receive retroactive compensation." *Id.*, vol. III at 681, 772. However, at trial Ms. Miller also made clear she had "never testified that anyone told me I was going to receive retroactive compensation." *Id.* at 773. Ms. Yager also testified that upon being asked by Ms. Miller whether she would receive retroactive pay, Ms. Yager responded it "was highly unlikely that the company would consider that, but [she] wasn't going to discount anything . . . ." *Id.*, vol. IV at 950.

Despite Ms. Miller's and Ms. Matthewson's belief that the position upgrades would occur soon after their July meeting with Ms. Yager, nothing happened. Later that month, Ms. Miller contacted a member of the human resources department in California and inquired as to the status of the job review process. She was informed the process had not yet begun, but that "[a]ll positions in New Mexico (as well as Texas and Hawaii) are going to be evaluated hopefully this year." *Id.*, vol. VI at 1287; *id.*, vol. III at 683. Ms. Miller was "shocked and dismayed" at this response because it was her understanding that the upgrades "were just around the corner." *Id.*, vol. III at 683. Ms. Miller testified that in asking Ms. Yager about the delay, Ms. Yager assured her that "there was no

problem at all with the upgrade.  The upgrade was going to take place.  It was simply a matter of the timing . . . ."  *Id.* at 684.

Ms. Yager met with Ms. Miller and her mother again in late September 1999.  She said she was sorry the process was taking so long, but "[s]he was not clear about a time line . . . because she couldn't get a time line from human resources."  *Id.* at 687.  In an effort to garner more information about the job evaluation process, Ms. Matthewson contacted human resources in October.  The response from the human resources staff member indicated that

> [a]s far as I know, those positions are being looked at and it is expected that they will be upgraded to reflect more of your current duties.  Those positions will not be even looked at until next month sometime, and should be completed prior to January.  When the study is done it is expected that they will include the items you mentioned including job description, status and compensation. . . .  Since they have not even been started yet, it is hard for me to give you much more info.  Our compensation department will be working on them along with your local management and Public Affairs management here in California.  Hope this helps – currently I don't have more definitive answers.

*Id.*, vol. VI at 1289; *id.*, vol. III at 689.  Ms. Miller and her mother were "shocked [and] upset," *id.*, vol. III at 689, by the response, and could not understand why the process was taking so long "especially when [Ms. Yager] had adamantly said that she had submitted all the paperwork necessary and that the job upgrade was just around the corner . . . ."  *Id.* at 690.

Ms. Yager was equally "devastated" to learn the upgrade review process

was so delayed.  *Id.*, vol. IV at 894.  She testified it was her "understanding, at least in the fall of 1999, that [human resources] was, in fact, working on [the] positions," *id.* at 893, and it was her belief that completion of the process "was imminent."  *Id.* at 894.  Her perception from speaking with staff in the human resources department was that "everything was on track for the job study to be completed by the end of the year."  *Id.* at 947.  Hence, she was "upset" to learn that the process "had not even been started yet."  *Id.* at 894.  It was very important to her that the regular positions be created because she had "been telling Ms. Matthewson and Ms. Miller that the process was happening and it would be soon" and "that the job study would be completed by the end of the year."  *Id.*

Ms. Yager had another meeting with Ms. Miller and her mother during the first week of November to further discuss the upgrade process.  Ms. Yager confirmed that at the meeting Ms. Miller stated she "thought the company was not treating her equitably . . . it wasn't fair . . . [and] was discriminatory."  *Id.*, vol. II at 289.  In an affidavit, Ms. Miller also stated she

> knew that the traffic reporters were paid nearly the same that [she was], but the traffic reporters did not perform any "lead" traffic reporting duties and did not perform public affairs specialist duties. It seemed very unfair and [she] could not find any other explanation for these differences except [her] sex . . . . [She] complained to [Ms. Yager] that [she] thought what the company was doing was discriminatory, that it was not right, and that it was unfair.

-14-

*Id.* at 340; *see also id.* at 289-90 (Ms. Miller stated her "pay was unfair compared to the men in the department"). Ms. Yager informed the Human Resources department that Ms. Miller "thought she was being treated unfairly, that she was being discriminated against, and that she thought she was being treated differently than male employees." *Id.* at 290.

On November 17, Ms. Yager met with Alice Bisno, her then direct supervisor, and two other members of the human resources department, to discuss her request to create two new regular positions in her department. While Ms. Yager had previously discussed the upgrade requests with Ms. Bisno, the meeting "was the first time [they] actually talked about possible ways to reorganize" the department. *Id.*, vol. IV at 896. Ms. Yager testified that her understanding of the purpose of the meetings, as well as her request for upgrades, was to move the jobs from "hourly position[s] to . . . regular position[s]." *Id.* at 897. She did not recall ever directly engaging in a conversation about eliminating Ms. Miller and Ms. Matthewson's hourly positions, nor was a "conscious decision" ever made in this regard. *Id.*, vol. I at 156. Rather, she and her colleagues "looked at what the business needs of the operation were and we decided that those two part-time positions were not serving the needs of the department and that we needed two full-time positions. And it was my understanding that that's what the two employees were requesting as well." *Id.*; *see also id.*, vol. II at 298-300; *id.*, vol.

IV at 898-99.[10]

On December 15, 1999, Ms. Miller and her mother again met with Ms. Yager to inquire as to the status of the review process, and whether they would be classified as regular employees by Christmas so that they could take paid vacation over the holidays. Ms. Yager "told [them] there was no news . . . that the upgrade process had still not been completed, and it would be maybe sometime in January before . . . she could give [them] a final [report] on the upgrade completion." *Id.*, vol. III at 694. Ms. Yager apologized to the women for length of time it was taking to complete the process. Ms. Miller testified that "she said, 'I believe what the company is doing is morally wrong, and I don't agree with it, and I'm really sorry. And if you can just hang on a little bit longer, it's going to come through. I promise you.'" *Id.* at 696.

After the holidays, Ms. Miller testified that Ms. Yager was unable to provide the two women with any further information about the job evaluation process. Ms. Miller stated that upon asking Ms. Yager "when [she and her mother] could expect the upgrade . . . her response . . . was 'I have no idea. I have no idea.'" *Id.* at 702. On January 31, 2000, Ms. Miller again met with Ms. Yager. At that meeting, Ms. Yager indicated that

———————————

[10]Ms. Yager also affirmed that she was not in charge of how the upgrade process would proceed, and that "every step of the way, [she called] human resources and follow[ed] their direction." *Id.*, vol. VI at 907.

she didn't have any further answers for me at that time. She told me, encouraged me to talk to human resources about all of my concerns, because she didn't feel like she could answer those questions. She still told me that the upgrade was a certainty. That wasn't the issue. The issue was when it was going to be completed. . . . And then . . . we talked about the retroactive compensation . . . . [a]nd she said that she thought that I should receive the retroactive compensation.

*Id.* at 706.

Soon after that meeting, Ms. Miller and her mother learned they would be meeting with Ms. Yager and Ms. Bisno to address their employment concerns. In preparation for the meeting, Ms. Miller sent a memorandum to Ms. Bisno stating she hoped Ms. Bisno could "provide a detailed status report on our forthcoming job upgrades." *Id.*, vol. II at 379. She noted that while she understood the new job title for the upgraded position would be "Public Affairs Specialist II," she still had "no idea of the job responsibilities and parameters" of the position. *Id.* She further inquired as to what the "'grade' classification and salary band" was for the proposed new post. *Id.* She also stated "[i]n that it is illegal to do so, how am I to continue performing daily job duties outside of my classification, as I've done for over three years, without any promise of good faith or compensation on the part of the company?" *Id.* at 380.

Ms. Bisno, along with Ms. Yager, met with Ms. Miller and her mother in New Mexico on February 10, 2000. Ms. Bisno informed the women that as a result of the job study, their current part-time hourly positions were being

-17-

eliminated, and replaced by two new full-time regular positions. At that time, neither Ms. Bisno nor Ms. Yager knew "what the compensation for the position[s] would be." *Id.*, vol. III at 714.

Pursuant to AAA New Mexico policy, the new positions had to be posted and Ms. Miller and her mother would have to apply for them.[11] They were encouraged to apply for the new positions, but were also told there were no absolute guarantees they would be selected. The women were informed they would not receive any retroactive pay for the public relations duties they had performed under their "clerk, intermediate" titles. *Id.* at 717. Nonetheless, Ms. Miller stated that Ms. Bisno "said she would promise to investigate our concerns and our complaints about discrimination." *Id.*, vol. II at 347.[12]

---

[11]Ms. Yager testified she asked Clarence Sandy, a human resources staff member for the Automobile Club of Southern California who was assigned to human resources for AAA New Mexico, about the posting process for the new positions. He informed her Ms. Miller and her mother would have to apply for them. She indicated Ms. Miller and Ms. Matthewson would probably be unhappy to learn about the posting requirement, but he responded "[t]hat it was company policy that any new position in the company needed to be posted." *Id.*, vol. II at 299; *see also id.* at 302.

There existed only two exceptions to AAA New Mexico's new job posting requirement. First, if an individual's position was "being phased out through the Staff Reduction Program," *id.* at 389, "they have to be given first consideration, [and second,] . . . if someone is returning from a medical leave, then they're also given first consideration." *Id.*, vol. VI at 1042; *id.*, vol. II at 389.

[12]Ms. Bisno testified her initial understanding of Ms. Miller and her mother's concerns regarding "discrimination" was that "perhaps other employees were being treated better." *Id.*, vol. II at 327. She stated she knew the women

(continued...)

-18-

Ms. Yager was involved in drafting the job descriptions for the new positions. She maintained that they were not written with any one person in mind but instead were based on the business needs of her department. As she testified at trial, she and her colleagues

> looked at the needs of the department and wrote the job description around that. And when [she eventually] shared the job description with [Ms. Miller], [she] told her . . . "We can't write this job description specifically for you, because when you leave the company, then we have a job description that fits you but not the needs of the business. And so what we have to do is write the job description so it fits the need of the business and choose the most qualified candidate."

*Id.*, vol. IV at 925. She also testified that if Ms. Miller had applied for job, she would have considered her for the position because she "was the most qualified candidate." *Id.* at 927. She commented that

> [e]ven though . . . there were additional things in the job description that [Ms. Miller] hadn't done before, I felt that it was something that she could do. She could learn many of those things that she hadn't done in the past, and even though we were changing the focus of the job from . . . the primary focus before was traffic reporting and we were actually changing that to become a very minor part of the job and the public affairs piece was the greater piece, I felt [Ms. Miller] could do the job.

*Id.*, vol. II at 300. Ms. Yager also noted that while the new position required

------

[12](...continued)
were dissatisfied with issues regarding their pay, benefits, and job titles. *Id.* at 322. However, it was not until after both Ms. Miller and Ms. Matthewson left AAA New Mexico that she came to understand their claims of discrimination were grounded on "some protected basis." *Id.* at 322, 327.

some heavy lifting, she had previously made accommodations for Ms. Miller in this respect in her hourly position and would do the same in the new job.

The new jobs were not merely reclassified positions representing the work previously being performed by Ms. Miller and her mother. Rather, they included "everything they were doing plus things." *Id.*, vol. IV at 903, 918. Ms. Yager noted that her department's needs included positions in which the employees could devote more hours to their tasks as well as perform additional job duties. For example, she needed someone to act as an advocate on behalf of the company. Ms. Yager commented that "[w]e analyze information, and based on the information we analyze, propose legislation. So I certainly wanted [someone doing legislative advocacy work]." *Id.*, vol. II at 294. She also stated she needed "someone to be able to synthesize, research and be able to come up with programs based on research." *Id.*

In regard to the position best suited for Ms. Miller, Ms. Yager testified there were several aspects of the new job Ms. Miller did not perform as an hourly employee.[13] In reviewing the job description for the new post, Ms. Yager noted Ms. Miller

---

[13]When asked to compare Ms. Miller's performance of public affairs duties against that of a job description for a similar *regular* post at the Automobile Club of Southern California, Ms. Yager testified that under that job description, Ms. Miller was not fulfilling all the duties that would be expected of a full-time regular Public Affairs Specialist.

wasn't developing strategic approaches to project assignments. She was doing limited research and investigation. She was not providing technical authoritative information resource. She was not . . . [c]omp[iling] and synthesiz[ing] information . . . . [S]he was not evaluating "research findings and interpret[ing] for policy development." She was not tailoring "research results to become [an] advocacy tool in [the] public forum. She was not recommending "strategies and issues to management for policy development." She was doing very limited "influenc[ing] and persuad[ing] policy of affiliate organizations." . . . She was not . . . [acting as an] "advocate within coalitions to further organizations, member and insured interests." She was not interpreting and refining "policy incorporating affiliate and organizational feedback."

*Id.* at 294-95. None of these tasks had previously been assigned to Ms. Miller in her hourly position. Rather, Ms. Yager had been performing the tasks herself. Likewise, there were duties inherent to a regular public relations position, like being on-call for the company, that Ms. Miller was not performing.

Ms. Miller and her mother sent a memorandum to Ms. Bisno soon after the February 2000 meeting outlining their understanding of what transpired and asking a series of follow-up questions. *Id.*, vol. VI at 1298-1300. Nothing in the memorandum alleged discrimination based on protected status. On February 24, Ms. Bisno informed Ms. Yager and the other human resources staff members involved in the restructuring of Ms. Yager's department that she

did not intend to respond to the memo . . . it's all the same issues discussed at our meeting in New Mexico. The employees simply do not like the answers they got and, until we come to some resolution, I don't intend to change them and don't see much value in repeating them.

-21-

*Id.*, vol. II at 381; *see also id.* at 332.

In early March 2000, Ms. Miller had a meeting with Clarence Sandy, the human resources staff person assigned to AAA New Mexico, to "address some of [her] concerns over departmental inequities as they relate to job title, description, status, compensation and benefits." *Id.* at 384. In a follow-up memorandum memo to Mr. Sandy, Ms. Miller noted that all the male traffic reporters hired in the PGA department had started at higher rates of pay than her starting rate of pay, even though they came to the job "with little or no broadcast experience." *Id*. at 385. She further asserted that

> I currently make a few cents more per hour than the two other Traffic Reporters I trained and continue to manage, both men. I perform "LEAD Traffic Reporter" operational duties while wearing the second hat of "Public Affairs Specialist," while these other employees do nothing more than come and go to report traffic on a part-time or back-up basis.

*Id.* While she understood that "club policy on compensation and benefits can vary widely from department to department within the company," *id.* at 386, she nonetheless believed that "this type of arbitrary allocation [where she was working 35 hours a week, but still being paid as a part-time hourly employee] appears unusual in [her] experience and because it is arbitrary – inherently discriminatory." *Id.*[14] She also stated that as a result of the company's

_____

[14]Ms. Matthewson sent a similar e-mail message to Ms. Yager on March 13,
(continued...)

"inequities and inconsistencies . . . in compensation," she

> felt particularly exploited. It's led me to believe, after having forthrightly expressed my concerns to [Ms. Yager] over the years about compensation, lack of communication and direction, etc., that the treatment I've received in this department as to compensation and the denial of benefits, is egregiously unfair, retaliatory and discriminatory.

*Id.* at 385.

In response, Mr. Sandy testified that "none of [Ms. Miller's] statements . . . would fit 'discriminatory' because hourlies don't have benefits unless you became a regular employee." *Id.*, vol. I at 214. He also testified that in response to Ms. Miller's allegation as to discriminatory payment practices in the PGA department, he examined the departmental file but found Ms. Miller was making more than any of the other men in her department. Hence, he determined there was "really nothing there to support [a] discrimination [charge]." *Id.*

---

[14](...continued)
2000, stating she and Ms. Miller were
> disadvantaged as compared to you and the majority of AAA New Mexico employees who enjoy full benefits. . . . Of course, it is easy to see that the results of these inequities have created a condition which results in discrimination. I would think that the company would want to administer their wages and benefits consistently from department to department to eliminate the injustices [Ms. Miller] and I have suffered.

*Id.* at 382. Ms. Matthewson was eventually dismissed from her position. Ms. Yager testified that Ms. Matthewson was insubordinate and created a hostile working environment by refusing, among other things, to perform certain job duties asked of her.

Ms. Yager usually met with her staff for annual employee evaluations in the early spring, but she did not engage in a performance review with Ms. Miller in February 2000. She testified that Ms. Miller's

> performance had not been good, but I certainly understood, and wanted to be fair to her. She was very upset about the situation and I understood her being upset with [the new job creation process]. It took longer than any of us had ever anticipated, and I didn't think it would be fair to her to do an evaluation at that point. . . . [S]he had spent all of her time writing all of these memos [regarding the position evaluation process] and doing all this stuff . . . [so] I didn't think that [it] was fair to review her in this time period.

*Id.*, vol. II at 304-05. She also noted that within a week of the meeting with Ms. Bisno, Ms. Miller protested being evaluated in light of her unresolved questions regarding the reorganization of the department and the new public affairs position. Ms. Yager did perform an evaluation, however, for one of the men in the department, who subsequently received a wage increase.

> Ms. Miller declined to apply for the new position. At trial, she explained
>
> I knew that they wanted me out, and they were going to get rid of me no matter what. So I knew they had already made up their minds, that no matter what hoops I jumped through to apply for this position, I was not going to get the position. But beyond that . . . I would have not been eligible for the position by a couple of criteria.

*Id.*, vol. III at 738-39. In particular, Ms. Miller contended she did not meet two of the qualifications listed for the new post: a minimum of five years experience and a lifting requirement. Therefore, she thought that even if she applied for the post, it would not have been offered to her. Ms. Yager testified to the contrary

that Ms. Miller was "way over" qualified for the position in light of her work experience prior to joining AAA New Mexico. *Id.*, vol. IV at 923. Moreover, as referenced earlier, the company had already made accommodations to Ms. Miller regarding her lifting limitations, and would have done the same for her in the new post.

In light of Ms. Miller's decision not to apply for the new position, Ms. Yager contacted Mr. Sandy, who informed her that "once the full-time position was filled . . . the other position . . . would end." *Id.*, vol. II at 310. After a number of conversations between Ms. Miller and Ms. Yager, it was decided that Ms. Miller's last day of work would be May 5, 2000. Ms. Miller ended her employment with AAA New Mexico on that day. After screening applicants for the newly-created position, AAA New Mexico offered the job to a female applicant. That applicant declined the company's offer. AAA New Mexico then offered the position to a male, Dan Ware, who accepted the job at an annual starting salary of $35,000.

Ms. Miller filed this action in federal district court against AAA New Mexico. As relevant to this appeal, she claimed the company discriminated against her in violation of Title VII and the EPA. She specifically alleged AAA New Mexico did not adequately pay her for the work she was performing as compared to the compensation of men in her department, and that the company

-25-

paid the man who was offered the new position substantially more than she had been earning doing the same job. She also asserted she suffered retaliatory discharge under state and federal law when the company, in response to her allegations that she was being discriminated against on the basis of her sex, eliminated her position and forced her to apply for the newly created position. Finally, she brought New Mexico state law claims for breach of implied contract and breach of the covenant of good faith and dealing. These claims were premised on her assertion that AAA New Mexico promised she would automatically be placed in the upgraded position, but had, in bad faith, failed to do so.

A magistrate judge handled the initial stages of Ms. Miller's litigation, including the discovery process during which Ms. Miller and the company had some disputes. AAA New Mexico eventually moved for summary judgment on all of Ms. Miller's claims. The district court granted summary judgment on Ms. Miller's Title VII and EPA discrimination claims as well as her federal and state retaliation claims. The remaining claims proceeded to trial. After both parties presented their evidence, AAA New Mexico moved for judgment as a matter of law. The district court reserved its ruling on this matter and the case was submitted to the jury. The jury was unable to reach a verdict, and the court declared a mistrial. The company renewed its motion for judgment as a matter of

law, which the district court subsequently granted. Ms. Miller now raises a host of challenges to the district court's rulings.

## II

In order to address Ms. Miller's challenge to the district court's grant of summary judgment on her discrimination and retaliation claims, we must also disentangle a knotty discovery issue Ms. Miller raises. She requests that we reverse a ruling of the magistrate judge denying her motion to compel AAA New Mexico to produce specific documents and answer interrogatories. On appeal, she contends the evidence denied to her by the magistrate judge's ruling undermined her ability to sufficiently challenge AAA New Mexico's motion for summary judgment. Ms. Miller's appeal of the magistrate judge's ruling is thus inextricably intertwined with her challenge to the district court's summary judgment ruling.

As we discuss in more detail throughout this section, we determine the district court implicitly rejected Ms. Miller's challenge to the magistrate judge's ruling. So doing, and in the course of concluding the district court did not err in granting summary judgment to AAA New Mexico, we also conclude the district court did not abuse its discretion in rejecting Ms. Miller's challenge to the magistrate judge's decision. Because our resolution of Ms. Miller's discovery

claim is best understood in light of our examination of the district court's grant of summary judgment, we will address her challenges to the summary judgment ruling and intersperse within our analysis the relevant aspects of her discovery issues.

As mentioned earlier, "we review a grant of summary judgment de novo, applying the same legal standard as the district court." *Coldesina*, 407 F.3d at 1131 (citation omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1252 (10th Cir. 2001).

### A. Title VII discrimination claim

Pursuant to Title VII, Ms. Miller alleged she was compensated worse than similarly situated male employees. We apply the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), framework for evaluating Title VII claims. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002); *Bullington v. United Air Lines*, 186 F.3d 1301, 1315 (10th Cir. 1999), *overruled on other*

*grounds sub nom. by Boyler v. Cordant Techs., Inc.*, 316 F.2d 1137, 1140 (10th Cir. 2003). Under *McDonnell Douglas*, Ms. Miller is required to first establish a *prima facie* case of discrimination. In this context, we have stated "a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). The district court determined Ms. Miller failed to make out a *prima facie* case. We agree.

Ms. Miller contends there was a disparity in pay between what she received and how the other men in the PGA department were compensated. She also claims there was a disparity in compensation between what she was paid for doing public affairs duties and what was paid to the man who was hired for the new position. She has not established a *prima facie* case of gender discrimination with respect to either of these claims.

First, Ms. Miller has not shown that she was paid less than any of the other men in the PGA department. As noted earlier in the opinion, she and her male colleagues in the PGA department were all classified in the same manner and none of the men in the department ever earned more than she did barring a three month period in 1997 during which one man earned eight cents an hour more. Ms. Miller makes no effort to undermine these facts. Instead, she argues that

because she was performing additional public affairs duties as well as serving as "lead traffic reporter" for the PGA department, her rate of pay should have been substantially higher than that paid to the men in her department, who were only performing traffic duties. While this may be true, her argument is not that she was working the same hours as these men during which time she was doing far more work but only getting paid marginally more. Instead, the record reflects she was working thirty-five hours a week while the men in her department were only working fifteen hours a week.[15] While it is uncontested Ms. Miller performed more duties than the men in her department, she worked more hours than they did and was compensated at a slightly higher rate than they were. Hence, Ms. Miller has not shown she "occupied a job similar to that of higher paid males." *Id.*

Nor can Ms. Miller establish her *prima facie* case by arguing there was disparity in the pay she received and that paid to the man who accepted the new post. She essentially argues she was replaced by Mr. Ware, who then earned substantially more than she did for performing the same work. On these grounds, she appears to argue she was treated less fairly than a similarly situated employee.

But Ms. Miller and Mr. Ware were not similarly situated employees because they held two different positions. First, Ms. Miller was an hourly part-

---

[15]In her March 2000 memorandum to Mr. Sandy, Ms. Miller commented that the male employees "do nothing more than come and go to report traffic on a part-time or back-up basis." *Id.* at 385; *see also* Aplt. Reply Br. at 21-22.

time employee who performed a variety of traffic reporting and public affairs duties. Conversely, Mr. Ware filled a newly-created, full-time, regular position. Second, while there is no question Ms. Miller performed some of the duties that were included within the job description for the new post, the record indicates there were a number of central components of the new job that Ms. Miller did not perform in her capacity as "clerk, intermediate." Her case is similar to the female employee in *Sprague* who took on some advanced duties similar to those performed by other higher paid men in her company, but could not show that she "de facto" held the same position as the men. *Id.* at 1359, 1363. In like fashion to the employee in *Sprague*, Ms. Miller cannot show she was similarly situated with Mr. Ware such as to make out a discrimination claim. Her status as an hourly employee and the duties she performed in that position are not sufficiently similar to the position held by Mr. Ware. We therefore agree with the district court's conclusion that Ms. Miller failed to make a *prima facie* case of gender discrimination.[16]

---

[16]Ms. Miller's additional contentions regarding her alleged adverse treatment also fail. She asserts her starting pay in 1996 was less than that paid to men who joined the PGA department between 1998 and 2000. While this is true, none of the men during this time ever had hourly wages that surpassed Ms. Miller's. Second, she points to one instance in which a male employee in the PGA department received an employment evaluation and raise in 2000, while she did not. However, the record indicates Ms. Yager's decision not to engage in an employee evaluation with Ms. Miller in 2000 was in response, in part, to Ms. Miller's own protest that such an evaluation would be unfair in light of the

(continued...)

In order to so conclude, we must return to the thorny discovery question intertwined with Ms. Miller's summary judgment challenges. This requires us to detail some of the earliest stages of Ms. Miller's litigation against AAA New Mexico.

The majority of the pre-trial proceedings in Ms. Miller's action were conducted before a magistrate judge. During the course of discovery, a dispute arose between Ms. Miller and AAA New Mexico. On November 15, 2002, Ms. Miller filed a Combined Motion to Compel Answers to Interrogatories and Production of Documents and Motion for Sanctions against the company. On December 2, AAA New Mexico filed its response. It asserted that Ms. Miller's requests for discovery had been overly broad, and that it had long since objected to them. The company noted that five and a half months after it had objected to her discovery requests, on October 31, 2002, Ms. Miller sent a letter to AAA New Mexico outlining her specific disagreement with the company's discovery objections and demanding a response in five days. By that point in time, the discovery cutoff date of October 25, 2002 had passed and the magistrate judge had denied a motion to extend discovery. The company had advised Ms. Miller

---

[16](...continued)
outstanding questions regarding her proper job classification and duties. Finally, Ms. Miller makes vague reference to an equally vague notation found in Ms. Yager's notes regarding the job evaluation process stating, "sex change." App., vol. II at 311. None of these things are sufficient to establish a *prima facie* case of gender discrimination.

that it intended to respond but could not do so in the stated time frame. It pointed out that it had responded to Ms. Miller's letter on November 20, attempting to narrow or resolve the discovery disputes, but Ms. Miller had not replied to the letter. Given these circumstances, AAA New Mexico objected to Ms. Miller's motion to compel and for sanctions as untimely. It then reiterated some of its prior objections regarding the breadth of Ms. Miller's requests and also offered to produce some additional documents. In her Reply, Ms. Miller agreed to some of AAA New Mexico's requested limitations regarding the breadth of a few of her requests but also continued to make certain objections to the company's refusal to produce some information.

On December 23, 2002, prior to entry of any decision on Ms. Miller's motion to compel and for sanctions, AAA New Mexico moved for summary judgment. Ms. Miller filed an additional motion for sanctions on December 26. On January 21, 2003, the magistrate judge denied as untimely Ms. Miller's motion to compel and for sanctions, as well as her second motion for sanctions. The court cited Local Rule 26.6, which requires a party to file a motion to compel within twenty calendar days after a response. That "[r]ule states that 'failure to proceed within this time period constitutes acceptance of the objection.'" App., vol. II at 217. The magistrate judge also denied the motions for sanctions as untimely, pointing out the discovery cutoff date of October 25, 2002. *Id.*

On January 30, 2003, Ms. Miller filed a motion with the district court pursuant to FED. R. CIV. P. 72(a) objecting to the magistrate judge's denial of her motion to compel. The next day, she filed her brief in response to the company's motion for summary judgment. That document included the following language:

> Ms. Miller has a motion to compel pending which seeks additional discovery responses, including the personnel files of the males [sic] traffic reporters and the public affairs specialist, which could create additional factual support for [t]his Response if granted. Ms. Miller requests supplemental briefing of these issues if her motion to compel is granted.

*Id.* at 248. Throughout the rest of her summary judgment response, however, Ms. Miller never explicitly stated what additional evidence she needed from AAA New Mexico in order to sufficiently challenge its request for summary judgment.

In February, AAA New Mexico responded to Ms. Miller's objection to the magistrate judge's ruling on her motion to compel and for sanctions, disputing her claims that she had acted diligently in seeking additional discovery from the company on an informal basis. Ms. Miller filed a reply. The record does not reflect anything further regarding this matter until June 24, 2003, when the court filed the final pre-trial order. The pre-trial order contained a section asking whether there existed any discovery matters of which the court should be aware. In response, the following appeared: "Yes, Plaintiff objects to the Magistrate's denial of her motion to compel and motion for sanctions . . . . The additional discovery Plaintiff seeks relates primarily to comparable and similarly situated

-34-

employees." *Id.* at 414.

In a telephonic hearing on July 11, 2003, the district court addressed what it described as Ms. Miller's Motion for Discovery Sanctions. The court stated it had "considered the materials submitted in support and opposition" to the motion. Aple. App. at 6. It then focused on AAA New Mexico's belated production of two memorandums from Ms. Yager, which it characterized as "extremely relevant to the issue of breach implied employment contract." *Id.* at 7. Concluding that AAA New Mexico did not intentionally delay in producing the Yager memorandums, the court declined to grant monetary sanctions but did order the company to produce Ms. Yager for a supplemental deposition.

During the hearing, the court also indicated to the parties it was planning to grant summary judgment on the sex discrimination, retaliation, and EPA claims. At one point, the court addressed the parties and stated, "[i]f there are any discovery disputes, I do not want those matters to fester . . . . So do you have any questions of me?" *Id.* at 9. Ms. Miller's attorney did not mention the motion to compel nor did she object to the court's verbal indication of its intention to grant summary judgment to AAA New Mexico on the basis that she needed further discovery. On July 28, the district court issued its partial summary judgment ruling in favor of the company.

On appeal, Ms. Miller requests that in light of the district court's failure to

respond to her Rule 72(a) objection, we reverse the magistrate judge's denial of her motion to compel. For the following reasons, we decline to do so.

Pursuant to 28 U.S.C. § 636(b)(1)(A), magistrate judges have the authority to enter discovery rulings. *See Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997). "Review of the magistrate judge's ruling is required by the district court when a party timely files written objections to that ruling, and the district court must defer to the magistrate judge's ruling unless it is clearly erroneous or contrary to law." *Id.* Ms. Miller timely objected to the magistrate judge's discovery ruling, but there is no indication the district court explicitly ruled on her objections to the denial of her motion to compel. Nonetheless, we may properly construe a district court's failure to address arguments raised in a Rule 72(a) objection "as an implicit denial of those arguments" and a refusal to overrule the magistrate judge's order. *Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1116 (10th Cir. 2004); *see also Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 219-20 (5th Cir. 2000). Based on our review of the record, we are convinced the district court implicitly denied Ms. Miller's Rule 72(a) challenge.

During the course of the district court's telephonic hearing on Ms. Miller's sanction requests, the court stated it had reviewed all the materials in support of and opposition to her requests for sanctions. The record indicates Ms. Miller's initial motion for sanctions was combined with her motion to compel. The parties

engaged in significant briefing in regard to this initial motion, as well in response to Ms. Miller's additional sanctions request. The magistrate judge's ruling addressed both of Ms. Miller's requests for sanctions as well as her motion to compel. In her Rule 72(a) objection to this ruling, Ms. Miller challenged the denial of both her motion to compel and her motions for sanctions. She also mentioned her pending motion to compel in her response to AAA New Mexico's motion for summary judgment, albeit in a very general manner. Likewise, the pre-trial order indicates Ms. Miller again raised her outstanding discovery issues. Taken together, we are convinced the district court was duly apprised of the scope of Ms. Miller's arguments relating to both her motion to compel and her motion for sanctions. Given the court's denial of her motion for sanctions in conjunction with its subsequent order granting AAA New Mexico summary judgment on a number of the claims implicated by her discovery requests, we conclude the district court's silence on Ms. Miller's motion to compel was a conscious and implicit denial of her discovery requests and a refusal to overrule the magistrate judge's order. *See Hill*, 393 F.3d at 1116; *Alpine View Co.*, 205 F.3d at 219-20.

On appeal, Ms. Miller asks that we reverse the magistrate judge's ruling. In light of our conclusion that the district court implicitly rejected her motion to compel, it is more appropriate for us to determine whether the district court abused its discretion in so doing. *See Cummings v. Gen. Motors Corp.*, 365 F.3d

-37-

944, 952-53 (10th Cir. 2004) (citing *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550 (10th Cir. 1995)) (court of appeals will not set aside district court discovery rulings absent abuse of discretion). In this regard, "[s]uch an abuse will occur only when the judge renders 'an arbitrary, capricious, whimsical, or manifestly unreasonable' judgment." *Id.* at 953 (quoting *Coletti v. Cudd Pressure Control*, 165 F.3d 767, 777 (10th Cir. 1999) (further internal quotations and citations omitted)).[17]

---

[17]We also note that if Ms. Miller's true goal in challenging the denial of her motion to compel was to reopen discovery so as to garner additional evidence before the district court's summary judgment ruling, she should have filed an affidavit pursuant to FED. R. CIV. P. 56(f) seeking a continuance and explaining why she could not currently present facts to justify her opposition to the company's motion. Ms. Miller concedes she did not file such an affidavit. Aplt. Reply Br. at 26. Her failure to do so further undermines her challenge to the magistrate judge's discovery order, as well as her challenge to the district court's grant of summary judgment to AAA New Mexico.

Ms. Miller nonetheless argues that taken as a whole, her discovery pleadings, the statement regarding the pending motion to compel in her response to AAA New Mexico's motion for summary judgment, and her Rule 72(a) objection are sufficient to satisfy Rule 56(f). We do not agree. Rule 56(f) "may not be invoked by the mere assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable." *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 833 (10th Cir. 1986). Moreover, unverified statements in attorney memoranda, including a response opposing summary judgment, are not sufficient for a Rule 56(f) continuance. *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992). Ms. Miller's other attempts to halt the district court's summary judgment ruling are insufficient to square with our precedents.

We have held that "[w]here a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion [by the district court] in granting summary judgment if it is otherwise

(continued...)

-38-

We conclude the district court did not abuse its discretion in implicitly denying Ms. Miller's Rule 72(a) objection. As discussed above, the court had before it all of the arguments and materials it needed to make this determination. Included within these materials was Ms. Miller's response to AAA New Mexico's motion for summary judgment, in which she included only a very limited statement indicating that the personnel files of the other male traffic reporters in the PGA department as well as the personnel file for Mr. Ware, the man who held the new job, might "create additional factual support" for her summary judgment response. App., vol. II at 248. The statement in the pre-trial order was similarly limited. *See id.* at 414. Ms. Miller provided no details in these materials regarding how her opposition to AAA New Mexico's motion for summary judgment was undermined by the lack of additional discovery, nor did she file an affidavit pursuant to FED. R. CIV. P. 56(f). Under these circumstances, we cannot say the district court's implicit rejection of Ms. Miller's motion was "arbitrary, capricious, whimsical, or manifestly unreasonable." *Cummings*, 365 F.3d at 953.

---

[17](...continued)
appropriate." *Pasternak*, 790 F.2d at 832-33; *see also Weir v. Anaconda Co.*, 773 F.2d 1073, 1082 n.10 (10th Cir. 1985) (listing cases). Hence, even if we were to determine the district court did not implicitly deny Ms. Miller's Rule 72(a) motion to compel in the course of making its sanctions ruling and granting summary judgment to AAA New Mexico, Ms. Miller's failure to comply with Rule 56(f) would also undermine her challenge on appeal.

## B. EPA claim

Ms. Miller contended AAA New Mexico violated the EPA because it paid her a lower wage than members of the opposite sex doing equal work. To make a *prima facie* case under the EPA, Ms. Miller

> has the burden of proving that (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) the male employees were paid more under such circumstances.

*Sprague*, 129 F.3d at 1364 (quoting *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993) (further citations omitted)). We agree with the district court's determination that Ms. Miller failed to make out a *prima facie* case.

Ms. Miller's EPA claims mirrored her Title VII claims. She asserted the men in the PGA department were better compensated than she, and that Mr. Ware was paid more than she was for a substantially similar position. As we discussed above, the evidence indicates Ms. Miller was paid a higher hourly wage than all the men in her department. Her comparison of her work with Mr. Ware's job is equally faulty.

When addressing the "equal work" requirement of the EPA, we do not construe it broadly. "[W]e have stated that failure to furnish equal pay for 'comparable work' or 'like jobs' is not actionable." *Id.* (citations omitted). Instead, "in order to prevail in such an EPA action, the jobs must be substantially

equal in terms of skill, effort, responsibility, and working conditions." *Id.* (internal quotations and citation omitted). Again, much like the employee in *Sprague* who performed some but not all of the duties of higher paid male employees, *id.* at 1364-65, the same can be said of Ms. Miller. As we have thoroughly discussed, the record makes clear that while Ms. Miller did perform some of the duties that were included in the newly created post, she did not perform all of those duties. She simply has not made a *prima facie* case that the jobs were substantially similar. As with the Title VII claim addressed above, we conclude the district court did not err in its summary judgment ruling, or abuse its discretion in impliedly rejecting Ms. Miller's Rule 72(a) motion.

### C. Retaliation claim

Finally, Ms. Miller claimed AAA New Mexico retaliated against her by eliminating her hourly position and forcing her to apply for the new post after she had complained of sex discrimination. In order to state a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she was engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. *Duncan v. Manager, Dep't of Safety, City & County of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005); *Stover v. Martinez*, 382 F.3d 1064,

1070-71 (10th Cir. 2004); *see also Shovelin v. Central N.M. Elec. Co-op, Inc.*, 850 P.2d 996, 1006 (N.M. 1993) (setting out New Mexico state law requirements for retaliatory discharge claim). Once a plaintiff establishes her *prima facie* case, the burden shifts to the employer to offer a facially legitimate rationale for the adverse action. The burden then shifts back to the plaintiff to show the employer's explanation is pretext. *Stover*, 382 F.3d at 1071. The district court determined that Ms. Miller failed to make her *prima facie* case because there was not a sufficient causal connection between her complaints of discrimination and the elimination of her position and application requirement for the new post. The court also held Ms. Miller had failed to show the company's decision to perform a job study, create two new regular positions, and eliminate her hourly part-time position, was pretextual. We agree.

We find no real contest regarding Ms. Miller's assertions that she satisfied the first two prongs of the *prima facie* analysis for retaliation claims. The record indicates that in early November 1999, during a meeting with Ms. Yager, Ms. Miller first stated she "thought the company was not treating her equitably . . . it wasn't fair . . . [and] was discriminatory." App., vol. II at 289. Lodging a discrimination complaint is protected activity for retaliation claim purposes. *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001); *Archuleta v. Colo. Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 486 (10th Cir. 1991);

*Martinez v. City of Grants*, 927 P.2d 1045, 1053 (N.M. 1996). Likewise, the elimination of Ms. Miller's hourly position, along with the company's failure to promote her as allegedly promised, constitute adverse employment actions. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Duncan*, 397 F.3d at 1314 ("An adverse employment action must be materially adverse to the employee's job status. The adverse action must amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") (quotation omitted).[18]

The evidence also indicates that soon after Ms. Miller stated she believed

---

[18]We note that generally, "[i]n order for a plaintiff to assert that her employer retaliated against her by failing to hire, rehire, or promote her, that employee must have applied for the position she was denied." *Stover v. Martinez*, 382 F.3d 1064, 1072 (10th Cir. 2004). Here, Ms. Miller did not apply for the new position. But at this point in our analysis, we are not entirely convinced this fact wholly undermines her retaliation claim. Even if Ms. Miller could not assert that AAA New Mexico's failure to promote her was an adverse employment action, her hourly position was terminated. Moreover, her retaliation allegations appear to go hand in hand, rather than to be mutually exclusive. It was the final action of AAA New Mexico in restructuring the PGA department, in which Ms. Miller's current hourly position was eliminated and she was required to apply for the new job which supposedly had the same duties as her former post, that was the alleged retaliatory act committed by AAA New Mexico.

she was being treated in a discriminatory fashion, Ms. Yager and Ms. Bisno met, on November 17, 1999, to begin discussing how the PGA department might be reorganized to include two new full-time regular positions. During the course of these meetings and into January 2000, it was decided that Ms. Miller's hourly position would be eliminated, and she would have to apply for the newly created position pursuant to AAA New Mexico policy. This decision was announced to Ms. Miller in early February 2000, three months after her first articulated allegations of discrimination. It was not until after Ms. Miller decided not to apply for the new position and it was determined her last day at AAA New Mexico would be May 5, 2000, however, that her hourly position was eliminated.

The district court determined Ms. Miller failed to show a causal connection between her complaints of discrimination and the adverse employment actions she suffered. We agree, although on a slightly different timeline. The district court reasoned Ms. Miller began to complain of adverse treatment in March 1998, but it was not until May of 2000, nearly two years after her initial allegations of unfair treatment, that Ms. Miller's position was eliminated. On these grounds, the court determined that a sufficient temporal proximity was lacking between Ms. Miller's allegations of unfair treatment and her job termination. We draw a more narrow time frame.

Ms. Miller certainly expressed discontent from at least March 1998, and

-44-

throughout her employment at AAA New Mexico, regarding her compensation, job title, and work duties. But it was not until early November 1999 that she made any specific allegations regarding being treated in an unfavorable manner because of her sex. Within that same month, Ms. Yager and Ms. Bisno initiated a series of meetings to discuss how to restructure the PGA department and eventually settled on the elimination of Ms. Miller's hourly position and the creation of a new post for which she could apply. Ms. Miller was informed of these facts in February 2000, and in May of that year her hourly position was eliminated at the conclusion of her employment with AAA New Mexico. Hence, instead of a two year window of time between Ms. Miller's general complaints about her treatment and her departure from the organization, as found by the district court, there exists a six month window between Ms. Miller's allegations of discrimination based on her sex and the elimination of her post. Even within this more narrowly circumscribed timeline, however, Ms. Miller failed to satisfy the causal connection prong of her *prima facie* case.

We have held "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). However, "unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely

on additional evidence beyond mere temporal proximity to establish causation." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (citing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). In *Meiners*, we determined that a "six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient." *Id.* Here there exists a six month window between Ms. Miller's allegations of sexual discrimination and the elimination of her hourly position. This alone is insufficient to establish a *prima facie* case, and Ms. Miller does not point to much other evidence to support her cause.

Ms. Miller generally argues that the slow progress of the job review process led her to "suspect that something unlawful accounted for the delay." Aplt. Br. at 39. That seeming unlawfulness was connected to Ms. Miller's perception that she was being compensated less favorably than the men in her department. But her own suppositions regarding the delay in the job review process are not sufficient to establish a *prima facie* case of retaliation. *Cf. Amro v. Boeing Co.*, 232 F.3d 790, 798 & n.6 (10th Cir. 2000) (employee's own perceptions of lack of fair treatment insufficient to state Title VII claim); *Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177 (10th Cir. 2000) ("A plaintiff cannot create a triable issue of fact by making an assertion without supporting facts."); *Jones v. Denver Post Corp.*, 203 F.3d 748, 753-54 (10th Cir. 2000) (manager's perception of

employee performance is relevant for demotion claim, not employee's own evaluation of performance). She also argues that AAA New Mexico effectively "scrapped its promise" to upgrade her and "then set about finding a way to get rid of [her] . . . without it looking illegal." Aplt. Br. at 40. A review of the record negates this argument.

Long before Ms. Miller raised her concerns regarding discrimination, Ms. Yager had been advocating for changes in the PGA department. In particular, and in large measure due to Ms. Miller's inquiry as to whether she was being appropriately compensated for her work, Ms. Yager sought to obtain two regular employees in her department to perform public affairs duties, rather than having the work done by part-time hourly employees. During a series of depositions, Ms. Yager was repeatedly questioned regarding the process of deciding to eliminate Ms. Miller's hourly position and to create a new post in its place. Ms. Yager consistently testified that

> [t]here wasn't a conscious decision to eliminate positions. It was looked at what the business needs of the operation were and we decided that those two part-time positions were not serving the needs of the department and that we needed two full-time positions. And it was my understanding that that's what the two employees were requesting as well.

App., vol. I at 156. When asked the same question later, Ms. Yager responded: "I don't think my answer is any different to that question. We had two hourly positions which . . . were not meeting the needs of the department, and so when

-47-

we looked at all the information, we knew that full-time positions were needed."

*Id.* When questioned yet again as to why she did not just seek to upgrade the

positions rather than create two new posts, she stated

> I don't see that as a separate entity. When we looked at the tasks that
> were currently being done and the tasks that needed to be done, and
> we knew that the part-time hours were not enough, we knew that the
> employees were upset by being in part-time positions, we looked to
> see what would serve the needs of the department to the best of our
> ability.

 *Id.* at 209.[19]

Ms. Bisno was posed with a similar series of questions, and responded in

kind. She stated that the decision to eliminate the two hourly positions was made

> at the time that we were evaluating what we needed to do for public
> affairs in AAA New Mexico, what kinds of positions we needed.
> And since the determination was that we needed – we wanted two
> full-time positions rather than two part-time hourly positions, that's
> when the discussion was started . . . . [T]he plan when we started
> developing [it] was that we were not [going to] have hourly
> positions, we were [going to] have full-time positions.

*Id.*, vol. II at 326. When pressed as to why they eliminated the hourly jobs rather

than reclassifying their status from hourly to regular, she stated

---

[19]While Ms. Yager may have expressed a desire and intent to have Ms.
Miller serve in the regular position once it was created, the record indicates that it
was "company policy that any new position in the company needed to be posted,
and that [Ms. Miller] would have to apply for the position[]." App., vol. II at
299. When Ms. Yager learned of this fact, she knew Ms. Miller would be
disappointed and upset, but Ms. Yager "thought it was just a matter of policy so
[she] didn't think it was an unfair or unreasonable request to make." *Id.* at 300.

[b]ecause . . . aside from the hours, the positions were different. We looked at not only what we were doing, but what we needed to do, where we had to be in the future, and what the responsibilities of the positions ought to be. And they were not the same as we had under the current arrangement. So they were different enough. And constantly in conversation with our hierarchy, with Human Resources, the decision was, we would eliminate the old, create the new.

*Id.* at 326-27. She further commented that "if [a] position changes sufficiently, you essentially eliminate the old group of positions and you create new positions." *Id.* at 327. When pressed by counsel as to why the hourly positions were not merely reclassified as regular, she again emphasized that the

> existing position as defined by the duties that were being done was not deemed to be the one that we needed for Public Affairs and AAA New Mexico, that we needed different responsibilities . . . . My understanding of a *reclassification* is when you look at the existing position and you evaluate the existing position and decide, for whatever reason, whether internal or external, that you need to change where you have that. The whole position gets moved. But the position itself doesn't change. The job duties don't change. The qualifications needed don't change.

*Id.* at 329 (emphasis added). Ms. Miller has pointed to nothing contrary in the record except her own assertions that she was entitled to be placed in the new position. We thus conclude she has failed to "provide evidence other than temporal proximity to establish a prima facie case." *Meiners*, 359 F.3d at 1231.

We also agree with the district court's ruling on pretext. Ms. Miller's pretext argument seems to dovetail with her *prima facie* position regarding AAA New Mexico's elimination of her hourly post and creation of the regular position.

-49-

A grant of summary judgment is appropriate where a plaintiff cannot meet the burden of proving that an employer's articulated nondiscriminatory reason for an alleged retaliatory action is pretextual. *Kelley*, 220 F.3d at 1174. "An employee may demonstrate pretext by showing the employer's proffered reason was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover*, 382 F.3d at 1071 (citing *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1120 (10th Cir. 2001)). Ms. Miller has failed to do so here.

In an attempt to show AAA New Mexico's elimination of her position and creation of the new post were pretext for dismissing her for her complaints of discrimination, Ms. Miller cites to *Butler v. City of Prairie Vill.*, 172 F.3d 736 (10th Cir. 1999). While *Butler* does present some initial similarities to Ms. Miller's case, we are not persuaded it supports her pretext argument.

In *Butler*, an employee brought a retaliation claim under the Americans with Disabilities Act (ADA), asserting he was terminated as a result of his requests for accommodations under the ADA. *Id.* at 751-52. In response, his employer maintained his position was eliminated as a result of the reorganization of the department in which he worked. On appeal, we held that genuine issues of material fact existed as to whether the employer's proffered reason for terminating the plaintiff was pretextual. We noted most of the plaintiff's former job duties were resurrected in a new position nine months after the departmental

-50-

reorganization and his termination. Moreover, after he had requested an accommodation, "he received more work than he could successfully complete and his supervisors complained about having too much work because they had to cover for him." *Id.* at 752. Finally, his position was the only one to be eliminated while it was occupied. *Id.* We also pointed to the temporal proximity of other events during the plaintiff's employment which supported his pretext argument. For example, the employer's "decision to reorganize [the department] occurred within weeks of Plaintiff's delivery of a complaint" to the mayor about his supervisor, *id.*, and his work evaluations "declined sharply within the months after" he informed his employers of his disability and need for accommodations. *Id.* We also commented that the duties of the new position appeared to substantially overlap the duties the plaintiff had previously held. *Id.* at 750. These facts together created genuine issues of material fact regarding whether the employer's reasons for terminating the plaintiff were pretextual.

Ms. Miller claims her case is sufficiently analogous to *Butler* to warrant a reversal of the district court's grant of summary judgment to AAA New Mexico on her retaliation claim. We disagree. First, in contrast to *Butler*, Ms. Yager instigated the job study and departmental reevaluation process long before Ms. Miller ever alleged she was being discriminated against because of her sex. As we have already stated, Ms. Yager's initiation of this process was driven in large

-51-

measure by Ms. Miller's own questions as to whether she was appropriately classified and paid for the work she was performing. Moreover, Ms. Yager, as well as Ms. Bisno, testified it was always their understanding that as a result of the job study, there would no longer be two hourly part-time positions in the PGA department, but instead the department would have two full-time hourly positions. While the review of the department's needs and the final creation of the two new positions did not occur until after Ms. Miller raised her claims of discrimination, we do not think this temporal proximity is sufficient to undermine the record presented by AAA New Mexico that it had been involved in the job evaluation process for some time, and that the decision to create two regular positions in lieu of the hourly posts was anything other than a legitimate business decision.[20]

---

[20]We are also not convinced by Ms. Miller's argument that failure to exempt her from AAA New Mexico's requirement that the new jobs be posted was evidence of pretext. AAA New Mexico's posting policy indicates that "[a]ll positions are listed in the job vacancy bulletin, 'Opportunity Knocks.' Exceptions may be made to: Consider [an] employee returning from a family, pregnancy or illness/injury leave of absence, if qualified for a job guarantee. Consider an employee whose position is being phased out through the Staff Reduction Program." *Id.* at 389. Ms. Miller makes no convincing argument as to how she would be exempted under the policy.

We further disagree that the close timing of Ms. Matthewson's termination in relation to the events in this case is additional evidence of pretext. Ms. Matthewson, who is not a party in this litigation, was fired within a month of the February 2000 meeting for insubordination and for creating a hostile work environment. But Ms. Miller poses no challenge to the articulated reasons given by AAA New Mexico for her mother's termination. Rather, she merely contends that the close proximity of her mother's firing with her own allegations of discrimination creates pretext as to AAA New Mexico's decision to eliminate Ms.

(continued...)

Second, Ms. Miller argues that similar to the employer in *Butler*, AAA New Mexico eliminated her position but then created a new position with substantially the same job duties. We have already rejected this similar argument in the context of Ms. Miller's Title VII and EPA claims, and do so again here. The new job held by Dan Ware was not merely a refashioning of the work previously performed by Ms. Miller. Rather, it represented a significant refocus in job duties as well as additional duties that Ms. Miller had not performed in her hourly post.

Ms. Miller also contends Ms. Bisno's statement that she did not intend to respond to Ms. Miller's concerns regarding discrimination is additional evidence of pretext. We are not convinced. Nothing in the follow-up memorandum Ms. Miller and her mother sent to Ms. Bisno after the February 2000 meeting indicated they had any workplace discrimination concerns. Nor has Ms. Miller presented anything to undermine Ms. Bisno's statements that it was not until after Ms. Miller quit working for the company that Ms. Bisno became aware her claims of discrimination were based on "some protected basis." App., vol. II at 322, 327. Hence, Ms. Miller has presented nothing to indicate Ms. Bisno's

---

[20](...continued)
Miller's hourly position and create a new regular position for which she could apply. Even if the temporal proximity of her mother's firing with Ms. Miller's allegations of discrimination might support her initial retaliation charge, Ms. Miller has failed to demonstrate pretext by showing AAA New Mexico's reason for firing her mother "was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover*, 382 F.3d at 1070-71.

disinclination to respond to the women's articulated concerns, none of which addressed issues of sex discrimination, is further evidence that AAA New Mexico intended to retaliate against Ms. Miller for her claims of discrimination.

Finally, we reject Ms. Miller's claim that the process by which the AAA Texas office treated an employee in a situation somewhat similar to Ms. Miller's supports her pretext argument. Ms. Miller asserts that around the same time AAA New Mexico was engaged in the job study for the new position, the AAA office in Texas was engaged in a similar process. The Texas organization was in the final stages of receiving approval to fill a newly created Public Affairs Specialist position and in the mean time, was given permission by human resources to employ a woman named Rose Rougeau as a part-time temporary hourly employee. Ms. Rougeau was to perform the duties of the soon to be finalized position. Once final approval for the position was received, the Texas office had permission to migrate Ms. Rougeau from the temporary hourly position into the regular post. Ms. Bisno, who was involved in this process, testified that "when we arranged the temporary hours, it was with the understanding that if the relationship worked out satisfactorily when the position was created, that [Ms. Rougeau] would be moved into it." *Id.* at 325. She also stated Ms. Rougeau and the Texas office "knew what duties she was hired to perform, but [Ms. Rougeau] was aware that at the time we did not have a position to offer her." *Id.* at 324. Ms. Rougeau did not

oppose the terms of this arrangement, and after working on a temporary hourly part-time basis for about four months, and upon the finalization of the regular Public Affairs Specialist position, she moved into that job without having to apply for it.

Based on the events which occurred in the Texas AAA office, Ms. Miller contends AAA had a policy of automatically transferring hourly employees into regular positions and should have done the same for her. She argues the company's failure to do so is further evidence of pretext. While the two situations do bear a measure of similarity, we are not convinced the facts surrounding Ms. Rougeau's job advancement are sufficiently analogous to Ms. Miller's case to support her argument. In contrast to Ms. Rougeau's situation, when Ms. Miller began working for AAA New Mexico, she began as an hourly employee and continued to do so throughout her tenure for the company. Nor was any promise made to Ms. Miller in the hiring process that a regular position was on the verge of creation and immediately available for her to fill if she was interested. Furthermore, unlike Ms. Rougeau, who was specifically hired to perform the duties of a Public Affairs Specialist, despite the salaried position not being quite yet finalized, Ms. Miller was hired to perform traffic reporting duties within an established clerk position. It was only later during her time at the company that Ms. Miller agreed to take on additional public affairs duties.

Therefore, the facts surrounding Ms. Rougeau's advancement are inapposite to Ms. Miller's situation and insufficient to support her claims of pretext.

In conclusion, Ms. Miller has made numerous broad assertions in an attempt to show that AAA New Mexico's decision to eliminate her hourly position and create a new post for which she was required to apply was pretext for its alleged retaliation against her for making a discrimination claim. Viewing these assertions as whole, we agree with the district court that Ms. Miller has failed to show that the specific manner in which AAA decided to reorganize the PGA department was pretext for releasing her.

Nor are we persuaded the district court abused its discretion in implicitly rejecting Ms. Miller's Rule 72(a) motion regarding this claim. In the assorted material before the district court, Ms. Miller asserted generally that she needed a variety of additional documents. These included information on how other complaints of employment discrimination or retaliation were handled by AAA New Mexico, as well as any documentation regarding her own claims of discrimination; personnel files regarding other public affairs specialist positions with the larger AAA organization; any additional documents in Ms. Yager's possession regarding Ms. Miller or Ms. Matthewson; and any documents having to do with Ms. Miller's job evaluations and the job study process. As noted earlier, however, Ms. Miller did not highlight in her response to AAA New

Mexico's motion for summary judgment what additional information she was lacking, and how the presence of such evidence would support her in undermining AAA New Mexico's motion for summary judgment on her retaliation claims. Rather, the single sentence in her summary judgment response seems to speak more in terms of her Title VII and EPA claims and does not make any direct reference to her retaliation claims. Ms. Miller's statement included in the pre-trial order is similarly silent regarding her retaliation claims. Nor did she file a Rule 56(f) affidavit. Finally, in her reply brief on appeal, Ms. Miller limits her discovery argument to her Title VII and EPA claims stating "if remand occurs on the discrimination or EPA claims, production should too." Aplt. Reply Br. at 26. Coupled with our determination that the district court did not err in granting summary judgment to AAA New Mexico on Ms. Miller's retaliation claims, we conclude the district court did not abuse its discretion in implicitly denying her Rule 72(a) motion.

## III

We finally address Ms. Miller's argument that the district court erred in granting judgment as a matter of law to AAA New Mexico on her claims for breach of an implied employment contract and the covenant of good faith and fair dealing. A close read of the trial record indicates the district court permitted Ms.

Miller's breach of implied contract claim to be presented to the jury on very narrow grounds. The court construed Ms. Miller's claim to be that, after allegedly agreeing to place Ms. Miller in a promoted position and after Ms. Miller allegedly fulfilled the duties of the new position, AAA New Mexico retroactively altered the terms of the agreement by failing to place Ms. Miller into the position once it was finally created. The court concluded such a claim was not barred as a matter of law, and permitted evidence to be presented to the jury. The jury was to determine if, in fact, AAA New Mexico had entered into such an agreement with Ms. Miller, and if so, whether she was entitled to retroactive pay in light of AAA New Mexico's failure to comply with the alleged contract.

After each side presented its evidence, the company moved for judgment as a matter of law. While the district court expressed great skepticism that sufficient evidence existed to support Ms. Miller's claim, it nonetheless reserved its ruling on the company's motion and referred the matter to the jury. The court declared a mistrial after the jury was unable to reach an unanimous verdict on Ms. Miller's claims. In accordance with FED. R. CIV. P. 50(b)(2)(B), AAA New Mexico renewed its motion for judgment as a matter of law. The court subsequently ruled in the company's favor, reasoning that Ms. Miller had failed to point to "any specific and binding promise by AAA," app., vol. II at 552, that would permit a jury to determine the company had impliedly contracted with Ms. Miller to

upgrade her position, or that she should receive retroactive compensation.

AAA New Mexico presents two alternative arguments in challenging Ms. Miller's appeal on this issue. It initially contends that pursuant to the New Mexico Court of Appeals rulings in *Stieber v. Journal Publ'g Co.*, 901 P.2d 201, 204 (N.M. Ct. App. 1995), and *Gormley v. Coca-Cola Enters.*, 85 P.3d 252, 259 (N.M. Ct. App. 2003), *aff'd on other grounds*, 109 P.3d 280 (N.M. 2005), Ms. Miller's at-will status precludes her implied breach of contract claim as a matter of law. In the alternative, it contends that even if Ms. Miller was entitled to bring the contract claim, she failed to present sufficient evidence to permit a jury to determine that such a contract existed. Ms. Miller's implied contract claim fails under either approach.[21]

### A.  Claim barred as a matter of law

We begin by noting that we need not employ the same analysis relied upon by the district court. Rather, "we may affirm the judgment of the district court on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *V-1 Oil Co. v. Means*, 94

---

[21]In light of our conclusion that Ms. Miller's implied breach of contract claim fails, we need not decide whether the district court erred in granting judgment as a matter of law on her breach of the covenant of good faith and fair dealing claim. We likewise need not address her associated challenges to the district court's jury instructions on her breach of contract claim, or its limitations on damages available for the same.

F.3d 1420, 1423 (10th Cir. 1996); *see also United States v. Davis*, 339 F.3d 1223, 1227 (10th Cir. 2003); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1157 (10th Cir. 2001). Addressing the company's first argument against Ms. Miller, we conclude that as a matter of New Mexico law, Ms. Miller's implied contract claim against AAA New Mexico was precluded on the basis of her at-will employment status.

AAA New Mexico contends that *Stieber* and *Gormley* wholly control the disposition of this case and bar any implied contract action by Ms. Miller. While we inevitably determine the rationale underlying *Stieber* and *Gormley* supports the company's argument, we are not entirely persuaded these two cases automatically preclude Ms. Miller's claims. *Stieber* and *Gormley* certainly do place limits on an at-will employee's ability to bring certain types of implied contract claims. However, those two appellate court cases do not definitively answer the question at issue here: can an at-will employee bring an implied contract claim for an employer's failure to fulfill promises to make future changes to a job?

When assessing the propriety of a district court's disposition of state law claims, we have the "duty to apply state law as announced by the state's highest court." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1230 (10th Cir. 2000). Absent controlling precedent, we "must attempt to predict how the state's highest court

would resolve the issue." *Royal Maccabees Life Ins. Co. v. Choren*, 393 F.3d 1175, 1180 (10th Cir. 2005); *see also Rancho Lobo, Ltd. v. Devargas*, 303 F.3d 1195, 1202 n.2 (10th Cir. 2002); *FDIC v. Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000). "In conducting our inquiry, we are free to consider all resources available, including decisions of New Mexico courts, other state courts and federal courts, in addition to the general weight and trend of authority." *Schuchmann*, 235 F.3d at 1225. Decisions of intermediate courts, while not controlling authority, may be evidence for "ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Rancho Lobo, Ltd.*, 303 F.3d at 1202 n.2 (quoting *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1132 (10th Cir. 2002) (further internal citations omitted)).

In New Mexico, employment contracts are generally for an indefinite period and deemed to be at-will. *Garcia v. Middle Rio Grande Conservancy Dist.*, 918 P.2d 7, 10 (N.M. 1996); *see also Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 779 (N.M. 1993). "An at-will employment relationship can be terminated by either party at any time for any reason or no reason, without liability." *Hartbarger*, 857 P.2d at 779. There exist two exceptions to this rule, however: "wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge."

*Id.*

A majority of New Mexico at-will employment implied contract cases address the standard question of whether an implied contract has "restrict[ed] the employer's power to discharge." *Id.*; *see also id.* at 786-87 (neither company policies nor verbal and written statements by employer were sufficiently explicit to create an implied contract limiting employer's ability to terminate employee without just cause); *McGinnis v. Honeywell, Inc.*, 791 P.2d 452, 457-58 (N.M. 1990) (implied contract existed by virtue of company's published policies that altered employer's ability to fire employee at-will); *Forrester v. Parker*, 606 P.2d 191, 192 (N.M. 1980) (company personnel policy guide sufficient to create implied contract limiting employer's right to discharge employee without just cause); *Hudson v. Vill. Inn Pancake House of Albuquerque, Inc.*, 35 P.3d 313, 318 (N.M. Ct. App. 2001) (policies outlined in handbook and company's general adherence to policies, created an implied contract by which company could not fire employee without just cause, or without following specified procedures); *Mealand v. E. N.M. Med. Ctr.*, 33 P.3d 285, 292 (N.M. Ct. App. 2001) (handbook altered at-will relationship, thereby precluding employer from at-will discharge of employee); *Kiedrowski v. Citizens Bank*, 893 P.2d 468, 472-73 (N.M. Ct. App. 1995) (terms of handbook and employer's conduct raised genuine issues of material fact warranting implied contract claim to be submitted to jury).

New Mexico law also makes clear that where an employment relationship remains at-will, an employee cannot bring a breach of implied contract claim against her employer for prospective changes the employer makes to the conditions of employment. *See Gormley*, 85 P.3d at 259; *Stieber*, 901 P.2d at 204. AAA New Mexico contends that the facts of Ms. Miller's case fall squarely within the ambit of *Stieber* and *Gormley*, and Ms. Miller is therefore precluded as a matter of law from bringing an implied breach of contract claim against AAA New Mexico for failing to promote her. But a careful examination of *Stieber* and *Gormley* leads us to conclude that the type of implied contract claim raised and rejected in those cases is distinguishable from the implied contract claim asserted by Ms. Miller.

In *Stieber*, the New Mexico Court of Appeals rejected an at-will employee's implied breach of contract claim where the employee claimed that after her employer assigned her job duties representing a promotion, she was later assigned tasks contrary to the promotion, effectively resulting in a demotion. 901 P.2d at 203-04. In essence, the breach of contract claim was based on the assumption that the employee had a vested right in the current terms of her employment, *i.e.*, the duties associated with her promotion. When her employer changed those terms by requiring her to perform duties not in accord with her promoted status, she alleged her employer breached the terms of her employment.

The court rejected the employee's argument, reasoning that "an employer's right to terminate an employee at will necessarily and logically includes what may be viewed as a lesser-included right to insist upon prospective changes in the terms of that employment as condition of continued employment." *Id.* at 204. The court went on to hold that "[n]o breach of contract action may lie where the employer in an at-will employment relationship may prospectively change the conditions of employment at will." *Id.*

A similar situation was presented in *Gormley*. There, an at-will employee had worked for his employer for approximately ten years as a route driver and delivery man. *Gormley*, 85 P.3d at 254. His employer eventually assigned him to a warehouse position which included lighter duties but did not impact his hours or pay. He was told he could remain in the warehouse position and maintain his work hours until he retired. Approximately four years later, the employee's hours were decreased and his duties altered. He continued working for at least another year, but subsequently resigned from the position. *Id.* at 254. He brought an implied breach of contract claim, asserting he had a contract right to the specified number of hours and duties promised to him until he retired. *Id.* at 259. While the appellate court determined a grant of summary judgment to the employer on this question was inappropriate, it nonetheless emphasized that on remand, "resolution of this issue depends on the fact-finder's determination regarding [the

employee's] employment status." *Id.* Citing to *Stieber*, the court stated that if an employee remains at-will, "then any claims regarding breach of contract as to hours and duties would necessarily fail." *Id.* at 259.

The type of claims raised and subsequently deemed invalid in *Stieber* and *Gormley* are different from Ms. Miller's claim. She is not asserting AAA New Mexico breached a contract with her by altering the terms of her current employment. Rather, we construe the essence of Ms. Miller's claim to be that AAA New Mexico promised to promote her and failed to do so. Hence, Ms. Miller's claim is not about her reliance on *present* employment terms which were undermined by AAA New Mexico's alteration of those terms. Instead, she is contending that AAA New Mexico's promise regarding *future* terms was never fulfilled. We therefore cannot fully agree with AAA New Mexico that Ms. Miller's claim is wholly resolved by the rulings in *Stieber* and *Gormley*. Nonetheless, we are persuaded the rule articulated in those cases can legitimately and logically be extended to bar an at-will employee from bringing a breach of implied contract claim for an employer's failure to fulfill a promise to make future changes to the terms of employment.

If, pursuant to *Stieber* and *Gormley*, an at-will employee cannot rely on her *present* terms of employment because the employer retains the right to make *prospective* changes to the terms and conditions of employment, *Stieber*, 901 P.2d

-65-

at 204, then it is reasonable to conclude that an at-will employee is equally barred from relying on an employer's statements regarding *future* changes regarding the terms of employment. Where an at-will employee cannot bring a breach of contract claim for alteration of her current terms of employment, a breach of contract claim for violation of potential future terms appears equally, if not more, tenuous.

Other jurisdictions addressing a similar issue have rejected at-will employees' breach of implied contract claims. *See, e.g., Rouse v. Boehringer Mannhiem Corp.*, 108 F.3d 859, 859 (8th Cir. 1997) (pursuant to Iowa law, at-will employee cannot enforce employer's promise to promote merely by continuing to work); *Shelton v. Ernst & Young, LLP*, 143 F. Supp. 2d 982, 991-92 (N.D. Ill. 2001) (under Illinois law, at-will employee cannot bring failure to promote claim); *Edwards v. U.S. Fid. & Guar. Co.*, 848 F. Supp. 1460, 1465 (N.D. Cal. 1994) (under Maryland law, at-will employee cannot bring breach of contract claim for rescinded promotion); *Rodgers v. Prudential Ins. Co. of Am.*, 803 F. Supp. 1024, 1031-32 (M.D. Pa. 1992) (Pennsylvania law precludes at-will employee from bringing breach of contract claim for employer's promise to promote); *Moore v. BellSouth Mobility, Inc.*, 534 S.E.2d 133, 135-36 (Ga. Ct. App. 2000) (under Georgia law, no claim for failure to promote can be brought by at-will employee); *Tinkham v. Jenny Craig, Inc.*, 699 N.E.2d 1255, 1257 (Mass.

App. Ct. 1998) (under Massachusetts law, promise to promote at-will employee is illusory). In light of the rationale supporting the *Stieber* and *Gormley* decisions, neither of which has been corrected or undermined by subsequent New Mexico Supreme Court rulings, coupled with supporting authority from other states, we predict that if faced with this particular question, the New Mexico Supreme Court would hold an at-will employee is barred from bringing an implied breach of contract claim for an employer's failure to promote. On purely legal grounds, therefore, we conclude Ms. Miller was barred from bringing her breach of implied contract claim against AAA New Mexico.

### B. Judgment as a matter of law

Even if we are wrong in divining the decision the New Mexico Supreme Court would reach on this question, we are persuaded the district court did not err in granting judgment as a matter of law to AAA New Mexico on Ms. Miller's implied breach of contract claim for lack of an evidentiary basis.

As referenced earlier, we review *de novo* a district court's grant of judgment as matter of law under FED. R. CIV. P. 50(b). *Tyler*, 232 F.3d at 812; *Corneveaux v. CUNA Mut. Ins. Group*, 76 F.3d 1498, 1502 (10th Cir. 1996). Judgment as a matter of law is only appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a

reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a)(1). We review all the evidence in the record, construing it and any inferences therefrom in favor of the non-moving party, and refraining from making credibility determinations and weighing evidence. *Tyler*, 232 F.3d at 812. Thus, "a court may grant the motion 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'" *Finley v. United States*, 82 F.3d 966, 968 (10th Cir. 1996) (quoting *Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1180 (10th Cir. 1989)). Even extending to Ms. Miller the benefit of all reasonable inferences, we cannot conclude the district court erred in its ruling.

Generally, the New Mexico courts have "upheld findings that there was no implied contract in cases where the alleged promise by the employer was not sufficiently explicit." *Hartbarger*, 857 P.2d at 780. "An employer creates expectations by establishing policies or making promises. An implied contract is created only where an employer creates a reasonable expectation. The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." *Id.* at 783. In ruling in favor of AAA New Mexico, the district court concluded that Ms. Miller failed to present the jury with anything but evidence of vague and indefinite promises that her position was being reviewed for an upgrade. The court ruled that none of

-68-

the promises could give rise to a reasonable expectation of a promotion, or a promise to retroactively pay Ms. Miller for the additional services she provided AAA New Mexico in anticipation of her potential upgrade.

In challenging the district court's ruling, Ms. Miller contends "there was sufficient evidence for the jury to decide that the statements, policies, conduct and practices of AAA [New Mexico], in combination, created a reasonable expectation by Ms. Miller that her position would be upgraded." Aplt. Br. at 19. We disagree. Certainly, there were statements made to Ms. Miller which could have led her to hope the current position which she held would be upgraded and she would be able to continue to work for AAA New Mexico in the newly created position. But our review of the record indicates the evidence is simply insufficient to show that AAA New Mexico's statements, policies, or practices were specific enough to create a binding promise upon which Ms. Miller could reasonably rely. *Hartbarger*, 857 P.2d at 783.

Ms. Miller first points to sections from AAA New Mexico's employee handbook and human resources manual to support her allegation that the policies outlined in those documents were sufficiently explicit to support her reasonable expectation that once she had started performing additional duties outside of her job description, she would be upgraded. We do not agree.

Under New Mexico law, an employee handbook or personnel manual may

alter the terms of an at-will relationship and give rise to an implied contract where the manual "controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlines." *Garcia*, 918 P.2d at 11; *see also Mealand*, 33 P.3d at 292 ("Plaintiff can prevail if the handbook modifies or supplements a pre-existing oral employment agreement."). Moreover, "an implied contract can still exist in spite of a [handbook] disclaimer, where the employer's conduct reasonably leads employees to believe that they will not be terminated without just cause and a fair procedure." *Kiedrowski*, 893 P.2d at 471. We do not question the expansive nature of the general terms appearing in the AAA New Mexico employee handbook, nor do we need to question what impact its disclaimer may have had on Ms. Miller's at-will employment at AAA New Mexico. Regardless of the handbook's terms, we find nothing in it of a sufficiently explicit nature to enable Ms. Miller to reasonably conclude that AAA New Mexico was obligated to upgrade her upon her performance of additional duties for the organization.

The employee handbook's section on compensation contains language which reads "[t]he objective of the compensation plan is to pay employees for the total contribution they make to the organization each year, tying employee performance to meeting organizational goals, and on paying for results, not just activity and effort." App., vol. VII at 1565. When discussing promotions, the

handbook indicates that

> [p]romotional increases are financial rewards which recognize increased responsibilities when employees are assigned to a higher grade level.  Promotional increases are not automatic. . . . When the promotion involves an increase of more than four grades, the promoting authority must submit a written recommendation to the Vice President, outlining the reasons and justification for the promotion.  Each situation will be reviewed individually to determine the appropriate salary increase.

*Id.* at 1567-68.  The handbook also details that

> [t]he Club maintains a position classification system whereby each position has a unique title and description of duties and responsibilities.  All positions are ranked in relation to others, and positions similar in level of responsibility and complexity are classified at the same grade level.  The classification plan, consisting of all grade level classifications and position titles, is evaluated by Human Resources.

> Any new classification or reclassification of an existing position will be based upon written analysis of the duties and responsibilities assigned to the position.

> A review of all jobs is periodically conducted by Human Resources.  Salary ranges will be adjusted periodically as external conditions warrant.

*Id.* at 1569-70.  Finally, in discussing temporary assignments, the handbook states

> [i]t may be necessary to assign an employee temporarily to a job within another salary range because of vacation, illness or other reasons.  A temporary assignment of this type does not require a status change.  However, if the assignment exceeds 30 days, Club policy requires that a formal change of status be submitted to Human Resources.

*Id.* at 1567.[22]

First, nothing in the handbook's statements regarding AAA New Mexico's overall objectives regarding its compensation plan, when promotions might be granted to employees, or how a job might be newly classified or reclassified, is specific or definite enough for Ms. Miller to believe that she was individually entitled to have her position upgraded from an hourly post to a regular position. Rather, the cited portions of the handbook speak in qualified generalities. *See id.* at 1565 ("[t]he *objective* of the compensation plan . . . ."); *id.* at 1567-68 ("Promotional increases *are not automatic*. . . . Each situation will be reviewed individually to determine the appropriate salary increase."); *id.* at 1569-70 ("Any new classification or reclassification of an existing position will be based upon written analysis of the duties and responsibilities assigned to the position. A review of all jobs is periodically reviewed by Human Resources. Salary ranges *will be adjusted as periodically external conditions warrant*.") (emphasis added throughout).

Second, an examination of the procedures outlined in the human resources manual regarding the creation of new positions not already classified, *see id.* at

_____

[22]The human resources manual, which will be discussed in more detail below, contains highly similar if not identical provisions to those identified in the employee handbook. *See* App., vol. VI at 1320 (objective of compensation plan); *id.* at 1323 (promotion policy); *id.* at 1325-26 (detailed description of job classification, reclassification, and creation of new job process); *id.* at 1323 (temporary assignment policy).

1326, indicates that AAA New Mexico followed these procedures, resulting in the new public affairs post in the PGA department. However, nothing in the human resources manual indicates that the company, in engaging in a job review process for a new position, was obligated to give Ms. Miller the new job. Furthermore, Mr. Sandy affirmed at trial that there was "nothing novel" about the process by which the new position was created. *Id.*, vol. IV at 1069.

Ms. Miller's reliance on the temporary assignment policy does not assist her. *See id.*, vol. VII at 1567; *id.*, vol. VI at 1323. When she began performing additional duties in her capacity of "senior clerk" and then "clerk, intermediate," she was not performing a job in "another salary range." *Id.*, vol. VI at 1323. Mr Sandy testified that Ms. Miller did not qualify for the terms outlined in the temporary assignments policy because she merely took on "additional responsibilities in her position as an intermediate clerk. That would not have been a temporary assignment. That would have been additional responsibilities in the position." *Id.*, vol. IV at 1061. Mr. Sandy further indicated that when Ms. Yager asked Ms. Miller in 1996 if she would be interested in taking on some public affairs work for the department, "there had been a discussion about the additional responsibilities and there was a discussion of what the salary would be for the position, and that's what was accepted. That would not be a temporary assignment. That would be a change in duties." *Id.* at 1082-83. Moreover, he

testified that the temporary assignment policy did not apply to hourly employees and that "[t]o [his] knowledge, the only people [he knew to] have been on temporary assignment [were] . . . regular employees within the organization." *Id.* at 1062.

Echoing the arguments she raised in her retaliation claim, Ms. Miller also points to the AAA Texas office's migration of Ms. Rougeau into a regular position as evidence that AAA New Mexico should have done the same for her. However, as we discussed earlier, we are not convinced the facts concerning Ms. Rougeau's advancement are sufficiently analogous to Ms. Miller's situation to warrant her belief that the company had a policy of automatically shifting employees from hourly to regular positions. In particular, in contrast to Ms. Rougeau's situation, when Ms. Miller began working for AAA New Mexico there was no regular position in existence, or even in formulation, in which she could be employed. Throughout her entire employment at AAA New Mexico, she worked as an hourly employee with a full understanding of the limitations of such a position. Nor, unlike Ms. Rougeau, was she promised at the start of her employment that a regular position would soon be in existence and hers for the taking. The facts surrounding Ms. Rougeau's advancement are inapposite to Ms. Miller's case and insufficient to support her implied contract claim.

Finally, Ms. Miller contends that AAA New Mexico, primarily through the

statements made by Ms. Yager, promised Ms. Miller that she would be upgraded to a regular position. Based on our review of the record, in which we have given her the benefit of all reasonable inferences, *see Finley*, 82 F.3d at 968, we conclude Ms. Miller has been unable to point to any sufficiently specific promise made by Ms. Yager upon which she could base a reasonable expectation that she was going to receive an automatic upgrade.

We, of course, accept Ms. Miller's assertions that Ms. Yager made promises and gave assurances that the upgrade process was moving forward and was going to happen. As Ms. Miller testified, Ms. Yager told her a number of times she was in the process of seeking an upgrade for her position, and that it was going to happen soon. *See* App., vol. III at 642 (company was going to evaluate positions and "good chance" post would be reclassified and graded at higher rate); *id.* at 643 (job review process would take "a few weeks, . . . maybe two to three months at the most"); *id.*, vol. IV at 1279 (Ms. Yager sent letter to supervisor requesting positions be upgraded); *id.*, vol. III at 657 (Ms. Miller "would receive an upgrade and be reclassified based on the information that [Ms. Yager] received from her management"); *id.* at 658-59 (upgrade would happen soon, within a few months); *id.* at 675 (upgrade process ongoing and would happen); *id.*, vol. IV at 891 (Ms. Yager included two regular positions in 2000 budget proposal); *id.*, vol. III at 678-79, *id.*, vol. IV at 892-94 (Ms. Yager

informed Ms. Miller job was in budget, upgrade would happen soon, and she could start using business cards); *id.*, vol. III at 684 (despite delays, upgrade going to take place); *id.* at 690 (upgrade "just around the corner"); *id.*, vol. IV at 894 (Ms. Yager informed Ms. Miller job study would be completed by end of year); *id.*, vol. III at 696 (Ms. Yager promised Ms. Miller upgrade was going to happen).

Ms. Yager's own testimony affirmed she made promises to Ms. Miller about the upgrade process. She testified, however, that her promises were more limited in nature than how Ms. Miller interpreted them. She noted "[w]hat was promised was the job study, but there was no promise of anything else." *Id.*, vol. V at 1161. "I definitely promised that the job study would go on and that there certainly weren't any guarantees, but I was doing everything possible to try to upgrade the positions." *Id.* at 1163; *see also id.*, vol. IV at 946 (Ms. Yager informed Ms. Miller she did not know extent of input she would have in upgrade process); *id.* at 891-92 (Ms. Yager noted initial success in keeping positions in 2000 budget, but also that there was a "long way" to go); *id.*, vol. III at 687 (Ms. Yager unclear about upgrade time line); *id.* at 702 (Ms. Yager had no idea when job review process would be completed).

Likewise, while Ms. Yager may have promised Ms. Miller she would receive an upgrade, the record makes clear that Ms. Yager did not possess the

power to fulfill such a promise. *See id.*, vol. IV at 855, 1032 (Automobile Club of Southern California directs all human resources decisions); *id.* at 857-58, 872-76, 1064, *id.*, vol. VI at 1279-80 (Ms. Yager required to ask direct supervisor for permission to request human resources to perform job study); *id.*, vol. IV at 1037, *id.*, vol. VI at 1325-26 (final upgrade approval required at executive levels); *id.*, vol. IV at 946 (Ms. Yager indicated she did not know extent of input she would have in upgrade process); *id.* at 891-92 (Ms. Yager able to keep positions in 2000 budget, but noted there was a "long way" to go); *id.*, vol. III at 687 (Ms. Yager not clear about timeline for upgrade); *id.* at 702 (Ms. Yager uninformed as to when job review process would be completed). Ms. Yager may have genuinely wanted to upgrade Ms. Miller, and Ms. Miller certainly believed Ms. Yager's promises and assurances. Nevertheless, Ms. Miller's reliance on Ms. Yager's promises evinces her lack of an understanding of AAA New Mexico's job review and new job creation process.

Finally, regardless of the promises Ms. Yager made, Ms. Miller was unable to articulate with any specificity the exact nature of what was promised. At most, Ms. Miller testified she was promised an upgrade. However, she was unable to state any of the specifics: when exactly the upgrade would occur, what exactly her anticipated job duties or job title would be, or how she would be compensated. *See id.* at 659 (Ms. Miller was not told when upgrade would occur or what

compensation she would receive); *id.*, vol. VI at 1296 (Ms. Miller notes in memorandum to Ms. Bisno that she has "no idea of the job responsibilities and parameters" or grade classification or salary band of potential new position).

At trial, Ms. Miller argued that her compensation could be properly calculated based on the pay range finally settled upon for the new position, and the wage paid to the individual who eventually accepted that post.[23] But, Ms. Miller has basically worked her way backwards into establishing a personal conclusion of what she might have been compensated, if she had applied for the position. She has failed to present any evidence that in the course of her ongoing discussions with Ms. Yager, she was ever given a specific salary amount of what she would receive in the new position.

Finally, Ms. Miller was unable to point to any specific promise made to her that she would receive retroactive payment for the public affairs duties she performed for AAA New Mexico in her hourly position. First, Ms. Miller stated at trial that she had "never testified that anyone told me I was going to receive retroactive compensation." *Id.*, vol. III at 773. Likewise, all of her statements about her conversations regarding retroactive pay with Ms. Yager indicate that her supervisor agreed that she *should* receive retroactive pay, but never guaranteed

---

[23]The base pay for the new position was just over $40,000, with the market rate being $44,308. When the position was finally filled, the new employee's salary, as determined by his experience and qualifications, was $35,000.

-78-

that such payment would occur. *See id.* at 681, 772 (Ms. Yager expressed opinion that Ms. Miller should receive retroactive pay for additional duties); *id.*, vol. IV at 950 (Ms. Yager expressed opinion that it was highly unlikely company would give Ms. Miller retroactive pay). Moreover, Ms. Miller's prior receipt of retroactive pay from the company did not necessarily indicate that in the present context, AAA New Mexico was obliged to pay her retroactively for the additional public affairs duties she performed. Mr. Sandy testified retroactive pay is generally awarded when there

> was an oversight. If an employee was supposed to be making $12 an hour, and the staff form was submitted for $10, and that's what [the company] had been committed to, then yes, we certainly would retroact back to that date, if the information supported the situation . . . . And also if the manager had committed to paying a person a certain amount, and the manager states that's what they told them, but for some reason, when the paperwork was submitted, there's a different amount, then we certainly would honor what the manager had committed to.

*Id.*, vol. IV at 1081.[24]

Having extensively reviewed the record and giving to Ms. Miller all inferences in her favor, we conclude the district court did not err in granting

[24]He also indicated that where an hourly position is replaced by a regular position, the hourly employee is not paid retroactively back to date of hire with regular pay. *Id.*, vol. IV at 1082. Rather, the date of the position advancement serves as the employee's new date of service for compensation purposes. *Id.*, vol. VI at 1328. Hence, even if Ms. Miller had filled the new position, she would not have been retroactively compensated for her prior public relations work for AAA New Mexico.

judgment as a matter of law to AAA New Mexico on Ms. Miller's implied contract claim. AAA New Mexico's polices, procedures, and statements were not definite, specific, or explicit enough for Ms. Miller to reasonably rely upon them to support her implied contract claim.

## IV

In light of the foregoing, we **AFFIRM** the district court.