**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

BRENDA BOYNTON,

        Plaintiff - Appellant,

v.

WESTERN WYOMING
COMMUNITY COLLEGE,

        Defendant - Appellee.

No. 04-8126

(D. Wyoming)

(D.C. No. 04-CV-16-J)

**ORDER AND JUDGMENT** *

Before **TACHA,** Chief Circuit Judge, **ANDERSON** and **KELLY** , Circuit Judges.

Brenda Boynton appeals the grant of summary judgment to defendant,

Western Wyoming Community College ("WWCC"), in her Title VII, 42 U.S.C.

§§ 2000e through 2000e-17, action alleging that her termination from employment

at WWCC was in retaliation for her complaint of sexual harassment. We affirm.

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Boynton was hired by WWCC as a full-time custodian at WWCC's Rock Springs campus on December 1, 1997. [1] WWCC concedes there was no dispute that she performed satisfactorily in that position. Appellee's Br. at 3. Her supervisor was WWCC employee Gary Bussart. On August 10, 1998, Boynton was promoted to the position of Maintenance/Custodian at WWCC's Green River facility, a position involving more substantial duties and a higher rate of pay.

Following this promotion, Bussart continued to supervise Boynton. Boynton initially received satisfactory evaluations in her new job, with notations that she was learning a new position and that improvement with time was expected in certain areas, such as her productivity and her communication with others. When Boynton became pregnant, she was permitted to take maternity leave.

In September 2000, shortly before her return to work following her maternity leave, Boynton met with WWCC President Tex Boggs, alleging that Bussart had sexually harassed her more than two years earlier, when she had still been working at the Rock Springs campus. Boynton alleged that, on two occasions while she was working at the Rock Springs campus, Bussart had inappropriately entered restrooms where Boynton was. Boynton further alleged

---

[1] An accurate recitation of the facts in this case, in particular the dates when specific incidents occurred, has been made more difficult than usual because neither party accurately and completely described the sequence of events.

that, after her transfer to the Green River Center, Bussart had made negative comments to her about her pregnancy and about women working, that he had asked her repeatedly when her baby was due, and that he had telephoned her at home while she was on maternity leave. She also alleged that he "disturbingly seemed to 'hover' over me and follow me around while I performed my duties." Boynton Aff. at ¶ 8, Appellant's App. at 22.

Boggs requested that the Dean of Administration, Marty Kelsey, join himself and Boynton to discuss Boynton's allegations. Kelsey was instructed to investigate the claims. He accordingly had a meeting with Boynton to gather information about her complaint and he interviewed others who might have relevant information. When interviewed by Kelsey, Bussart denied that the bathroom incidents or other incidents had occurred, and stated that he telephoned Boynton at home while she was on maternity leave to tell her that the locks had been changed on the Green River Center doors and that she would need to get new keys to get in upon her return. Boynton had told Kelsey that various other employees were aware of the incidents, but those employees told Kelsey that they were, in fact, completely unaware of such incidents. Kelsey also interviewed Mary Ann Huebner, the director of the Green River Center, inquiring whether she was "aware of any inappropriate behavior on [Bussart's] part at the Green River Center" without describing Boynton's complaint to her. Kelsey Dep., Appellant's

-3-

App. at 82. Kelsey testified that he "did not go into all of these allegations" with Huebner, but rather just asked her "some general questions." Id. at 84. Huebner indicated she was unaware of any inappropriate behavior by Bussart.

After completing his investigation, Kelsey wrote to Boynton on October 9, 2000, informing her that he had found no evidence substantiating her allegations. He stated that he "would be happy to visit with you again about these matters if you can bring some concrete evidence into the conversation." Memorandum, Appellant's App. at 98. Boynton never provided any further information to Kelsey or anyone else at WWCC.

During this time, Bussart followed up on the concerns relating to communication and productivity. Bussart received complaints from other employees at the Green River Center concerning communication problems and Boynton's failure to complete tasks. On October 10, 2000, Boynton received her scheduled annual evaluation. While her overall evaluation was satisfactory, in one of five subcategories ("communication") she was rated as "marginal." Id. at 107.

In March 2001, Boynton received an evaluation ranking her performance as unsatisfactory. Bussart established a remediation plan to address these concerns. While remediation was ongoing, Boynton filed a complaint on June 25, 2001, with the Wyoming Department of Employment ("WDE") and with the Equal

Employment Opportunity Commission ("EEOC"), alleging that she had been denied a more favorable work assignment and that she had been harassed and suffered discrimination because of her gender and her pregnancy, and that she had suffered retaliation because she had reported sexual harassment. This complaint was eventually dismissed, because the WDE concluded there was no reasonable cause to believe that WWCC had discriminated against her. The EEOC adopted the WDE's findings as its own and issued a 90-day right to sue letter. Boynton did not appeal this ruling, nor did she act upon the right to sue letter.

Meanwhile, Boynton continued to receive unsatisfactory evaluations. Accordingly, following an unsatisfactory evaluation in July 2001, Bussart recommended to Boggs that Boynton be terminated. In accordance with WWCC policy, Boggs invited Boynton to meet with him to discuss the recommendation and to respond to Bussart's evaluation and recommendation. Boggs decided not to terminate Boynton. He also determined that Huebner should be Boynton's supervisor, rather than Bussart. Huebner wrote a remediation plan, dated September 13, 2001, to assist Boynton in performing her job satisfactorily.

On February 28, 2002, Boynton received an evaluation again ranking her performance as unsatisfactory. Huebner designed another remediation plan, and Boynton's performance was evaluated again on May 28, 2002. Huebner again evaluated her performance as unsatisfactory. Huebner met with Boynton, told her

that her performance was not improving, and said that she had no real choice but to terminate Boynton. Boynton never mentioned discrimination or retaliation during this meeting.

Following Huebner's recommendation that Boynton be terminated, Boggs provided Boynton with a pre-termination notice listing the reasons for the proposed termination and offered to meet with her to discuss them. During their meeting, Boynton did not raise any claim of discrimination, nor did she suggest that she thought her termination was in retaliation for her complaints about Bussart. Boggs determined that good cause existed for Boynton's termination, and he so recommended. Boynton continued to work, while Boggs' recommendation of termination was addressed by the WWCC Board of Trustees, until she was suspended with pay effective October 29, 2002. [2]

The Board hired an independent hearing officer, a retired state district court judge, who conducted a hearing, created a record, and provided advisory findings of fact and conclusions of law to the Board. Boynton was represented by counsel

---

[2] Boggs sent Boynton her termination letter on August 1, 2002, which Boynton appealed on August 12, 2002. On October 24, 2002, Boynton was suspended without pay by Huebner for twenty-four work hours for insubordination, refusal to follow legal instructions, and gross neglect of duty, in connection with an incident in which Boynton refused to clean up mouse droppings from Huebner's desk, despite Huebner's specific directive to do so. On October 29, she was suspended with pay, and relieved of her duties, because she was overheard making what was believed to be a threat against Huebner.

before the hearing officer. The Board then reviewed all the materials created by the officer and issued its final decision on February 13, 2003, in which it upheld Boynton's termination.

Boynton filed a second complaint with the EEOC, alleging an incident involving Bussart and claiming that her termination was in retaliation for her complaint about sexual harassment. The EEOC again rejected her claim and issued a right to sue letter. This action was filed on the ninetieth day after the issuance of the 90-day right to sue letter.

Boynton initially included within this action claims for discrimination and hostile work environment against Boggs and Bussart, as well as WWCC. When WWCC moved for summary judgment on all claims, Boynton essentially conceded that summary judgment in favor of Boggs and Bussart was proper, as well as summary judgment for WWCC on the discrimination claims, leaving only her claim that WWCC terminated her in retaliation for her September 2000 allegation of sexual harassment.

The district court granted summary judgment to WWCC on Boynton's remaining claim, concluding:

> there is no evidence whatsoever to permit any reasonable inference that there was any causal connection between Boynton's complaints to President Boggs in September of 200[0] and her termination, which ultimately became effective in 2003. All of the evidence suggests that Boynton's termination was for unsatisfactory performance of her job duties. She had been on three separate

remediation plans and failed to meet her supervisor's expectations for improved performance. She had numerous opportunities to improve; she did not do so. It is clear that WWCC offered legitimate, nondiscriminatory justifications for its decision to terminate Boynton's employment at WWCC.

Order at 24-25, Appellant's App. at 149-50. The court further concluded that Boynton "has not carried her burden of proof that the defendant WWCC is entitled to summary judgment as a matter of law on her claim of retaliation in violation of Title VII." Id. at 152.

Boynton appeals, arguing the district court erred in granting summary judgment to WWCC because genuine issues of material fact exist regarding (1) the causal connection between her protected activity and her termination; and (2) whether WWCC's proffered reasons for her termination were pretextual.

We apply the following familiar and well-established standard of review:

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.

Although the movant must show the absence of a genuine issue of material fact, he or she need not negate the nonmovant's claim. Once the movant carries this burden, the nonmovant cannot rest upon his or her pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof. The mere existence of a scintilla of

evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is "genuine"; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant.

Garrison v. Gambro, No. 04-1409, 2005 WL 2982279, at *1 (10th Cir. Nov. 8, 2005) (quoting Fed. R. Civ. P. 56(c)) (further quotation omitted).

To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must demonstrate that (1) she was engaged in protected opposition to discrimination; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." Miller v. Auto. Club of New Mexico, 420 F.3d 1098, 1119 (10th Cir. 2005). Once the *prima facie* case is established, "the burden shifts to the employer to offer a facially legitimate rationale for the adverse action. The burden then shifts back to the plaintiff to show the employer's explanation is pretext." Id. at 1120.

The district court concluded that Boynton failed to establish a *prima facie* case because there was an insufficient causal connection between her complaint of discrimination and/or harassment and her termination several years later. The court also determined that Boynton failed to demonstrate that WWCC's reasons for terminating her were pretextual. We agree, for substantially the reasons set forth in the district court's order granting summary judgment.

We accordingly AFFIRM the district court's order granting summary judgment to WWCC on Boynton's Title VII claim.

-9-

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge